**DISCOVISION ASSOCIATES, Plaintiff,**

v.

**DISC MANUFACTURING, INC.,**
**a Delaware Corporation,**
**Defendant.**

**Civil Action No. 95–21–SLR.**

United States District Court,
D. Delaware.

Oct. 26, 1998.

302

Edward M. McNally, Peter A. Pietra, Morris, James, Hitch (Thomas J. Nolan, John S. Schuster, Christopher A. Mathews, Ben M. Davidson, of Howery & Simon, Los Angeles, California, Anthony C. Roth, D. Michael Underhill, Penelope M. Lister, Robert Gaybrick, Richard S. Meyer, Nathan W. McCutcheon, of Morgan, Lewis & Bockius LLP, Washington, DC, Frederick S. Frei, Stephen L. Sulzer, Stuart Huang, and Gary J. Rinkerman, of Steptoe & Johnson LLP, Washington, D.C., of counsel), for plaintiff.

R.H. Richards, III, of Richards, Layton & Finger, Wilmington, Delaware (James R. Blanchard, Joel W. Benson, Allan J. Sternstein, Harold V. Johnson, Thomas J. Filarski, Gustavo Siller, Jr., George I. Lee, Christopher M. Cavan, Steven G. Steger, and Ajay K. Gambhir, of Brinks, Hofer, Gilson & Lione, Chicago, Illinois, Michael Chertoff, Robert J. Gunther, Jr., John T. Brennan, of Latham & Watkins, Newark, New Jersey, of counsel), for defendant.

## OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

Plaintiff DiscoVision Associates ("DiscoVision") filed this action against defendant Disc Manufacturing, Inc. ("DMI") on January 17, 1995, alleging infringement of six DiscoVision patents relating to optical disc technology. (D.I.1) On September 20, 1995, DiscoVision

filed an amended complaint which alleged that DMI infringed ten patents relating to optical disc technology. (D.I.63, 484) During discovery, DiscoVision voluntarily agreed to drop several of its patent claims.[1] (D.I. 287 at 14; D.I. 299 at 2; D.I. 308 at 2; D.I. 323 at 3) Prior to trial, DiscoVision further reduced its case to the following six patents: (1) U.S. Patent No. 4,819,223 ("the '223 patent"); (2) U.S. Patent No. 4,893,297 ("the '297 patent"); (3) U.S. Patent No. 4,228,326 ("the '326 patent"); (4) U.S. Patent No. 4,190,860 ("the '860 patent"); (5) U.S. Patent No. 4,337,538 ("the '538 patent"); and (6) U.S. Patent No. 5,373,490 ("the '490 patent").

The parties tried this matter to the court from October 6, 1997 to October 16, 1997. As a result of this court's claim construction order (D.I.558), DiscoVision did not present evidence of infringement with respect to the '538 and '223 patents and further reduced the number of claims it alleged DMI had infringed.[2] At trial, DiscoVision presented evidence of infringement on the following four patents and their respective claims: (1) DMI's compact discs ("CDs") and stampers infringe claims 1, 10, and 13 of the '297 patent; (2) DMI's version one mastering machine infringes claims 2 and 8 of the '326 patent; (3) DMI's version two mastering machine infringes claims 1, 16, and 21 of the '860 patent; (4) DMI's Philips mastering machine infringes claims 16 and 21 of the '860 patent; and (5) DMI's CDs, stampers, and master discs infringe claims 6 and 11 of the '490 patent. DiscoVision's infringement case is based on both literal infringement and infringement under the doctrine of equivalents.

DMI asserted the defenses of noninfringement and invalidity. More specifically, DMI proffered evidence that the '297 patent is: (1) invalid as anticipated under 35 U.S.C. § 102(b); (2) obvious under 35 U.S.C. § 103;

and (3) invalid under 35 U.S.C. § 112 because of (a) lack of enablement, (b) insufficient written description, and (c) failure to disclose the best mode. With respect to the remaining patents, DMI presented evidence of invalidity under § 103.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a). The following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## II. FINDINGS OF FACT

### A. Introduction

1. DMI is a Delaware corporation that engaged in the manufacture and sale of CDs during the time relevant to the issues of the complaint.[3] DMI operated CD manufacturing plants in Anaheim, California and Huntsville, Alabama. DMI's operations and CD manufacturing plants were sold to Cinram, Inc. on March 27, 1997. (D.I. 564, Ex. A at 1; D.I. 633)

2. DiscoVision is a California partnership with its principal place of business in Irvine, California. (D.I. 564, Ex. A at 1; D.I. 633) DiscoVision is the owner, by assignment, of the four patents at issue.

3. A CD is a type of optical disc. It stores encoded information or data that can be accessed by CD players which contain optical reading devices. During the relevant period, DMI manufactured and sold at least two types of CDs: (1) "CD–Audio," which contains music; and (2) "CD–ROM," which contains computer software and computer data. (D.I. 564, Ex. A at 1; D.I. 633 at 2) Industry standards for CDs are found in the "Rainbow Books" promulgated by Sony and Philips. (D.I. 606 at 1412–18; PX 77; PX 247 at 7; PX 984) The Rainbow Books include the "Red Book" (PX 72), which is the industry standard for CD–Audio, and the "Yellow Book" (PX 2123), which is the indus-

---

**1.** Pursuant to this court's order, the voluntary dismissal by DiscoVision of these patent claims is without prejudice, without collateral estoppel effect, and without evidentiary value. (D.I. 308 at 2)

**2.** In particular, DiscoVision withdrew its assertion that DMI's version two and Philips master-

ing machines infringed the '326 patent and its assertion that DMI had infringed claims 6, 8, 12, and 18 of the '860 patent.

**3.** DMI is a wholly-owned subsidiary of Quixote Corporation. (Plaintiff's Exhibit ("PX") 247 at 1)

try standard for CD–ROM. (D.I. 604 at 1410; PX 984 at 3) Compliance with these standards results in CDs which can be played on commercially available CD players. DMI's CDs are manufactured to comply with these industry standards. (D.I. 604 at 1409–18)

## B. The Gregg Invention: Optical Discs and the '297 Patent

### (1) The Development of Information Storage Technology

4. After World War II, there was a "strong felt need" for new "high-density" information storage technologies. (D.I. 607 at 2037–38) This need resulted in increased research activities during the 1950s through the 1970s. (D.I. 607 at 2038) One of the first major developments was the announcement in 1957 of a new magnetic video recording process. (D.I. 607 at 2038–39) This invention was widely recognized by those of ordinary skill in the art as the only efficient way of recording video. (D.I. 607 at 2039) During this same time period, however, scientists sought to invent a competitor to magnetic video recording. (D.I. 607 at 2040–47)

5. One of the technologies scientists explored was electrostatic recording. (D.I. 607 at 2041) In an electrostatic recording, information is represented by the presence or absence of electrical charges in a storage medium. (D.I. 607 at 2041) Electrostatic recording eventually failed because it did not have adequate storage density. (D.I. 607 at 2041)

6. Scientists also explored thermoplastic recording, which utilizes electrostatic techniques. (D.I. 607 at 2041) In a thermoplastic recording, plastic in the recording medium is turned into a fluid when it is heated to a high temperature. (D.I. 607 at 2042) The plastic is then deformed by the force of electrical charges and cooled to retain the deformities. (D.I. 607 at 2042) Information is represented by the presence or absence of these deformities in the record medium. (D.I. 607 at 2042–43) This technology was not successful because: (1) the process required a vacuum;

(2) the deformities were irregular and could not be contained in an information track; and (3) the recording was difficult to replicate. (D.I. 607 at 2042–43)

7. A third type of recording technique involves burning holes in a recording medium. Information is represented by the absence or presence of a hole. (D.I. 607 at 2044) Many different attempts at perfecting the hole burning technique were tried during the 1960s. (D.I. 607 at 2044) The hole burning technique was never commercialized, however, because it was difficult to control the size, shape, and location of the holes. (D.I. 607 at 2044)

8. Photographic recordings were also explored during this period. (D.I. 607 at 2045) This type of recording utilizes two-dimensional features to represent information. (D.I. 607 at 2045) In seeking to develop high-density storage capabilities, scientists encountered problems in perfecting the replication of photographic recordings since information is represented by two-dimensional features. (D.I. 607 at 2045)

9. Capacitive recordings were explored. (D.I. 607 at 2045–46) Similar to photographic recordings, replication problems were encountered in capacitive recording technology since these recordings involve two-dimensional features. (D.I. 607 at 2046)

10. Finally, the optical disc emerged as a viable competitor to magnetic recordings. (D.I. 607 at 2047) Optical disc technology was a significant development because information can be stored at a density more than one hundred times greater than was possible through magnetic recording. (D.I. 607 at 2048)

11. **Gregg's Initial Ideas.** In the late 1950s, David Paul Gregg, the inventor of the '297 patent, started to develop ideas about an optical disc. (Defendant's Exhibit ("DX") 464, Gregg 12/9/97 at 22–23) [4] At that time he called his idea a "videodisk" system. (DX 464, Gregg 12/9/97 at 23) He envisioned combining his knowledge of video recording, optical recording, and "phonograph disc art"

---

4. Depositions designated by the parties were submitted to the court on December 2, 1997 and

collectively labeled DX 464.

to invent a "video, optical disc." (DX 464, Gregg 12/9/97 at 23) Gregg knew that his videodisk system would have to be integrated seamlessly into the entertainment industry if it was to be a consumer product. (DX 464, Gregg 12/9/97 at 29) Accordingly, Gregg's "videodisk" system included ideas about the process of making master videodisks, the replication of videodisks, and the playback system. (DX 464, Gregg 12/9/97 at 31)

12. In 1964, Gregg and a partner founded Gauss Electrophysics to develop further his ideas about a videodisk system. (DX 464, Gregg 2/4/97 at 516–19) After forming this company, Gregg began to look for additional financing for his ideas from large corporations. (DX 464, Gregg 2/5/97 at 648–49) As early as 1965, Gregg documented his ideas in proposal form as part of his efforts to secure additional financing. (DX 90) He knew he needed the assistance of a large corporation because his proposed videodisk system would require "millions of dollars just to get started." (DX 464, Gregg 2/5/97 at 649)

13. **Earlier Patents: The '258 and '966 Patents.** At the same time that he was seeking financial support for his ideas, Gregg also began filing patent applications for his videodisk system. In November 1965, he filed his first patent application. This patent application eventually issued as U.S. Patent No. 3,530,258 ("the '258 patent") on September 22, 1970.[5] (DX 370) The '258 patent is entitled "Video Signal Transducer Having Servo Controlled Flexible Fiber Optic Track Centering." (DX 370, col. 1, lns. 1–4)

14. The abstract of the '258 patent provides:

A video signal reproducer pick-up head is provided for deriving video signals from a track on an optical recording medium; the pick-up head includes a movable support which is suspended over the recording medium, and means on the support for sensing the video signals recorded on the medium, the transducer being capable of

generating control signals which are applied to a servo control system which, in turn, controls the position of the support and thereby serves to maintain the sensing means in proper registry with the track on the recording medium.

(DX 370, col. 1, lns. 14–25) The recording medium disclosed in the '258 patent specification is identified as a "video recording disc having optical recordings of a video signal in a spiral track thereon which extends from the outer to the inner limits of the disc." (DX 370, col. 2, lns. 45–48) The specification includes a drawing of transparent disc 10 with surface indicia in a spiral track that represent optical recordings of a video signal. (DX 370, fig. 2)

15. The '258 patent discloses a "transmissive / nontransmissive" system for reading an optical video disc. (DX 370; D.I. 605 at 1535–39; D.I. 609 at 15) In a "transmissive" system, the plastic record disc has optical recordings that modulate a light beam when the disc is rotated. (DX 370, cols. 3–4; D.I. 605 at 1536) Information is recovered in a transmissive system by shining a beam of light on the spiral recording track while the disc rotates. The beam of light is modulated when it passes through the recording track, creating a pattern of optical contrast.[6] The pattern of optical contrast is received by an objective lens on the other side of the disc and translated into an electronic signal that is used to reproduce the information stored on the disc. (DX 370; D.I. 600 at 234–40; PX 1983; D.I. 605 at 1537–46)

16. On April 3, 1967, Gregg filed another patent application relating to his videodisk system. This application issued on March 4, 1969 as U.S. Patent No. 3,430,966 ("the '966 patent"), entitled "Transparent Recording Disc." (DX 88) The '966 patent discloses "an improved record disc having signals optically recorded thereon, which is particularly adapted for use in conjunction with the transducer head and system described" in the '258

---

5. The '258 patent indicates that a continuation-in-part application was filed on June 28, 1968 and the November 12, 1965 application was abandoned. (DX 370, col. 1, lns. 29–31; D.I. 605 at 1535)

6. "Optical contrast" refers to the difference in levels of light transmitted by the microgrooves and interval portions respectively. (PX 30, col. 5, lns. 7–16) In other words, optical contrast is produced by a change in optical intensities. (D.I. 600 at 210–16)

patent. (DX 88, col. 1, lns. 45–49) The record disc in the '966 patent is described as a "transparent plastic" disc with recordings formed in spiral grooves. (DX 88, col. 1, lns. 16–17) The '966 patent specification explains that video signals "are recorded in a spiral track on the record disc described in [the '258 patent] by means of a modulated electromagnetic beam, such as an electron beam or laser ray, and this track is sensed by the transducer head during the reproduction operation." (DX 88, col. 1, lns. 34–38)

17. One of the improvements disclosed in the '966 patent concerns the "construction" of the record disc to "protect[ ]" the recordings from "rough usage." (DX 88, col. 1, lns. 49–53) The record disc described as the preferred embodiment utilizes the transmissive system disclosed in the '258 patent. (DX 88, cols. 2–3; D.I. 605 at 1540–46) The '966 patent specification explains the manner in which information is retrieved as follows:

> When the record disc 10 is rotated in the turntable 11, and as described in detail in [the '258 patent], a light source is moved under the disc . . . with a transducer head . . . moved over the disc. The relationship between the light source and transducer head is such that the light from the light source passes through the optical recordings on the spiral track to be modulated thereby. The transducer head responds to the resulting modulated light beam to convert the same into corresponding video, or other signals, as described in [the '258 patent].

(DX 88, col. 2, lns. 24–34)

18. The record disc of the '966 patent is a transparent plastic disc with a "metallic deposit" that "interrupts the transparency of the disc in a particular pattern, so that a spiral optical recording track is formed on the disc." (DX 88, col. 2, lns. 18–21) The metallic deposits are formed only on the surface of the disc, while the "grooves and channels" on the disc "remain transparent." (DX 88, col. 3, lns. 13–15) The improved construction of this disc involves a transparent plastic coating over the side of the disc with the metallic deposits and transparent grooves and channels "so that [the record disc] cannot be corroded by handling, or the like, and to prevent it from becoming impaired by normal rough usage of the disc." (DX 88, col. 3, lns. 17–25) The '966 patent explains that the layer of transparent plastic has "the same index of refraction as the disc." (DX 88, col. 3, lns. 17–18) The '966 patent specification notes that "[a]lthough the recording medium of the present invention has been described in conjunction with the recording of video signals, it is apparent that audio or other signals may be recorded on the disc, if so desired." (DX 88, col. 3, lns. 31–34)

### (2) The '297 Patent

19. On June 6, 1968, Gregg filed a third patent application, which ultimately issued as the '297 patent on January 9, 1990.[7] (PX 30) The '297 patent is entitled "Disc-shaped Member." (PX 30) Since January 9, 1990, DiscoVision has been and still is the owner of the '297 patent. (D.I. 633 at 3) The '297 patent concerns the plastic record disc described in the '966 patent and a duplication process in which a multiplicity of such plastic discs may be formed. (PX 30, col. 1, lns. 15–34) The '297 patent specification explains that this invention is "related to" both the '258 and '966 patents. In particular, the '297 patent specification refers to the '966 patent in describing the "background of the invention":

> A transparent plastic disc is described in the copending application Ser. No. 627,701, now U.S. Pat. No. 3,430,966 issued Mar. 4, 1969, in which picture information in the form of video signals is recorded on one or both sides of the disc.

(PX 30, col. 1, lns. 16–21)

20. Claims 1, 10, and 13 are at issue with respect to the '297 patent. Claim 1 of the '297 patent describes the structure of a claimed "disc-shaped member" as comprising in part:

> [A] major surface area having a planar surface area and a plurality of spaced-apart, elongated, discrete surface indicia

---

7. The '297 patent is a continuation of several patent applications that relate back to the June 6, 1968 application, which was abandoned.

integral with said planar surface area and extending away from the plane of said planar surface, wherein:

said discrete surface indicia are sequentially arranged in a plurality of substantially parallel information tracks; adjacent surface indicia along each track are separated by interval portions of said planar surface area;

said parallel information tracks are separated by intertrack portions of said planar surface area;

said intertrack portions and said interval portions together define said planar surface; said discrete surface indicia have substantially uniform widths defining the width of said information tracks; ... said discrete surface indicia have variable lengths to represent stored information.

(PX 30, col. 5, lns. 28–49) Claim 10 of the '297 patent provides: "The disc-shaped member as set forth in claim 1, wherein said member is adapted for transferring surface indicia to a body of disc material." (PX 30, col. 6, lns. 16–18) Claim 13 of the '297 patent provides: "The disc-shaped member as set forth in claim 1, wherein said member comprises an information storage medium." (PX 30, col. 6, lns. 26–28; D.I. 607 at 2192–97)

21. The '297 specification contains a written description and drawings of one embodiment of the claimed disc. The written description does not use the term "surface indicia." Instead, the written description uses the term "discontinuous microgrooves." (PX 30, col. 3, ln. 10) The plastic disc is described as a laminated structure composed of three layers: (1) a relatively hard transparent plastic base; (2) a relatively soft transparent plastic layer; and (3) a partial metal or opaque mask. (PX 30, col. 3, lns. 34–37) The microgrooves are formed in the soft transparent layer and arranged in spiral-shaped tracks. (PX 30, col. 3, lns. 1–3, 38) The microgrooves are illustrated as elongated, rectangular-shaped "pits" or depressions in the surface of the disc separated by "lands" or interval portions. (PX 30, fig. 2) They are described as having "constant widths and constant depths and variable lengths representative of the recorded video signals." (PX 30, col. 3, lns. 11–13)

The spiral-shaped information tracks are referred to in the specification as "recording track[s]." (PX 30, col. 3, lns. 2–8) These recording tracks are separated by "intertrack" portions that are "coplanar" with the interval portions. (PX 30, fig. 2 and col. 3, lns. 13–20; D.I. 600 at 183–84) The specification indicates that these recording tracks "may have a width, for example, of the order of 1 micron, and the spacing between the adjacent convolutions of the disc may be of the order of 1 micron." (PX 30, col. 3, lns. 4–7)

22. The written description and drawings of the '297 patent refer to the "transmissive" system of recovering stored information on the disc as disclosed in the '258 patent. (PX 30, col. 1, lns. 21–30; D.I. 605 at 1593) As described, a metal coating is applied to the planar surface of a disc in order to increase the "optical contrast" between the planar surface and the bottoms of the microgrooves. (PX 30, col. 8, lns. 4–10) The bottoms of the microgrooves are not coated with any metal, leaving them transparent. (PX 30, col. 5, lns. 9–10) The '297 patent specification explains that "[i]n a finished disc, the surface has, arranged in a concentric spiral, deformities or discontinuities which are out of the plane of the surface and which deformities or discontinuities modulate impinging radiant energy to apply the information recorded on the disc to the radiant energy." (PX 30, col. 5, lns. 17–22) The '297 patent specification does not mention the protective coating of transparent plastic disclosed in the '966 patent. Gregg, however, considered the use of the protective coating to be the best way to make the videodisk. (DX 464, Gregg 1/8/97 at 424) Finally, although the '297 patent specification discloses "a particular structure and process," it notes that "modifications may be made." (PX 30, col. 5, lns. 23–24)

23. **Elements of Claim 1 of the '297 Patent.** There are eight elements of claim 1 relevant to the case at bar. First, information must be represented by three-dimensional, "discrete surface indicia." (PX 30, col. 5, lns. 29–30) Second, the discrete surface indicia must be sequentially arranged to form "a plurality of substantially parallel information tracks." (PX 30, col. 5, lns. 33–35)

Third, "interval portions" must exist that separate the surface indicia. (PX 30, col. 5, lns. 37–39) Fourth, the information tracks must be separated by "intertrack portions." (PX 30, col. 5, lns. 39–40) Fifth, the intertrack portions and the interval portions must form the planar surface area of the record disc. (PX 30, col. 5, lns. 41–42) Sixth and seventh, the discrete surface indicia must have "substantially uniform widths" that define the widths of the information tracks. (PX 30, col. 5, lns. 43–47) Finally, information must be represented by variable length surface indicia. (PX 30, col. 5, lns. 48–49)

### (3) The Prior Art[8]

24. **The Philips–Miller Article.** In April 1936, an article entitled "The Philips–Miller System of Sound Recording" was published ("The Philips–Miller article").[9] (DX 203) The article discloses a system of recording that avoids certain "disadvantages of mechanical reproduction as well as those of photographic recording" because "reproduction is effected by optical means and registration on the film by mechanical means." (DX 203 at 111) In the Philips–Miller system, sound is recorded by mechanical means using a cutter "or stylus shaped like an obtuse wedge." (DX 203 at 108) During the recording process, the cutter is used to remove a shaving from an opaque layer in the film tape. (DX 203 at 108; D.I. 607 at 2074–76; PX 1985) If the cutter is brought deeper into the film, a wider groove will be produced. (DX 203 at 108; D.I. 605 at 1626; D.I. 607 at 2074–76; PX 1985) The Philips–Miller article explains that as the cutter "moves up and down in synchronism with the sound vibrations to be recorded (perpendicular to the tape), a transparent track on an opaque background will be produced on the moving tape whose width will vary in synchronism with the sound vibrations (fig.3)." (DX 203 at 108) The optical reproduction of this sound track is achieved when "the fluctuations in light, i.e.[,] the modulation of the track width on the [film tape], are converted directly into voltage fluctuations." (DX 203 at 111) In

other words, the cutter peels away an opaque layer producing a variable-width groove so that varying amounts of light are transmitted through the film. (D.I. 607 at 2073; DX 1985)

25. **The Scope of the Philips–Miller Article.** The Philips–Miller article teaches an "analog" recording in which louder sound is represented by wider grooves. (DX 203, figs. 2 and 3; D.I. 606 at 1626, 1780–81) When there is no sound or modulation signal, the cutter continues to make a narrow groove. (DX 203, fig. 2; D.I. 606 at 1781, 1786; D.I. 207 at 2076–79; PX 1886; PX 1985; PX 1994) Accordingly, the Philips–Miller article does not teach a recording system where sound is represented by discrete surface indicia. (D.I. 606 at 1782; D.I. 607 at 2072, 2315–16)

26. In the Philips–Miller system, sound is represented by three-dimensional features since the grooves vary not only in width, but also in depth. (D.I. 607 at 2072) Nevertheless, this system is considered two-dimensional because it is "a variable-width record[ing]" system. (D.I. 606 at 1626; 607 at 2072–73) The Philips Miller article also does not teach three-dimensional replication techniques. (DX 203 at 113) Instead, it only refers to a two-dimensional (i.e., photographic) replication method. (DX 203 at 113; D.I. 606 at 1787–88)

27. **The Boswell Patent.** United Kingdom Patent No. 644,432 ("the Boswell patent") was published on October 11, 1950, and is entitled "Improvements in Recording and Reproducing Systems." (DX 201) The Boswell invention involves the combination of "pulse modulation" signals with magnetic, wire, optical, and capacitive recording devices. (DX 201 at 1, ln. 97 – 2, ln. 3; D.I. 607 at 2069–71) The Boswell patent describes this invention as "recording and reproducing systems in which the time function of the phenomena to be recorded is translated into variations of the physical or chemical properties of a carrier material and retained there-

---

8. The parties agree that the following prior art references were not considered by the Patent and Trademark Office ("PTO") during the prosecution of the '297 patent. (D.I. 605 at 1638; D.I. 605 at 1641)

9. The Philips–Miller article appears to have been published in the *Philips Technical Review,* volume 1, No. 4. (DX 203)

by as a function of position." (DX 201 at 1, lns. 9–15) In particular, the recording system has the following specific features relating to how sound is represented on a recording path:

[A] certain property or certain properties of the medium carrying the modulation are switched between one or the other of two extreme conditions, the two conditions of the carrier medium alternating in rapid succession along the direction of the recording. The modulation in accordance with this invention is contained in the relative intervals between the transitions from one extreme condition of the carrier properties to the other . . . .

According to a further feature of the invention, the sound to be recorded is caused to produce a pulse modulated signal and the pulses are recorded on one or more carrier material record blanks.

The record thus produced may be played back on [a] suitable apparatus and it may also be used for producing duplicate records.

(DX 201 at 1, lns. 68–97) The Boswell patent specification explains that the recording path may be linear in shape if the recording is on "a tape, strip or wire-like member." (DX 201 at 3, ln. 130 – 4, ln. 2) If the recording medium is a disc, then the recording path is shaped "spirally." (DX 201 at 4, ln. 2)

28. The Boswell pulse-modulation method for recording and reproducing sound "may be applied [ ] to photographic recording, magnetic recording or capacitive recording." (DX 201 at 1, ln. 98 – 2, ln. 3) The Boswell patent specification explains that "a photographic form of record may be produced mechanically as by the Philips–Muller system." [10] (DX 201 at 4, lns. 3–17)

29. The Boswell patent describes several different "pulse-modulating systems" and the resultant record of the waveform. (DX 201 at 4, lns. 34–37) In one of the systems, a "pulse-width modulated waveform" is described as "compris[ing] a series of pulses $p$ occurring at regular intervals $f$[,] i.e.[,] at a constant pulse repetition frequency and of

constant amplitude but whose individual width is determined by the amplitude of the controlling waveform $a$ at the instant of sampling, i.e.[,] at the related interval $f$." (DX 201 at 4, lns. 45–53, fig. 2(b)) The resultant record of this waveform has "alternat[ing] black and white sections $x$ and $y$ [that] represent the alternating different conditions of the record medium, e.g.[,] transparent and opaque sections of a photographic record . . . ." (DX 201 at 4, lns. 53–58, fig. 2(c)) The Boswell patent also describes "pulse-spacing modulation," "pulse-frequency modulation," and "pulse-code modulation." (DX 201 at 4, lns. 76, 111–12, 130 – 5, ln. 1, fig. 2(e)–(j))

30. **Boswell Patent Claims Relevant to the '297 Patent.** Claims 1 through 6 of the Boswell patent are relevant to the instant case and are reproduced below:

1. A method of recording sound or other transitory phenomena wherein a certain property or certain properties of a recording medium are changed alternately from one to the other of two different conditions along the direction of recording, the relative spacing intervals between the respective transitions from one condition to the other being varied in accordance with the variations of the phenomena to be recorded.

2. A method of recording sound as claimed in claim 1 wherein the sound to be recorded is translated into a pulsed signal form of modulation involving variation between two chosen signal levels only and then recording such signal pulses on a record blank.

3. A method of recording as claimed in claim 1 or 2 wherein the sound or other phenomena to be recorded is translated into a signal of the pulse-width modulated form.

4. A method of recording as claimed in claim 1 or 2 wherein the sound or other phenomena to be recorded is translated into a signal of the pulse-spacing modulated form.

---

**10.** *See infra* ¶ 36, explaining that the "Philips Muller" reference actually refers to the "Philips-Miller" system.

5. A method of recording as claimed in claim 1 or 2 wherein the sound or other phenomena to be recorded is translated into a signal of the pulse-frequency modulated form.

6. A method of recording as claimed in any of the preceding claims wherein the signal pulses are recorded as variations of the light transmitting properties of the record.

(DX 201 at 5, lns. 76–113)

31. **The Scope of the Boswell Patent.** The Boswell patent teaches a recording system that converts analog signals into a series of variable length pulses.[11] (D.I. 605 at 1614; D.I. 607 at 2086, 2105–06, 2313) The Boswell patent teaches that sound may be recorded as the variation between two different physical states or conditions. (D.I. 607 at 2105–06, 2313) Accordingly, the Boswell patent does not teach that sound is recorded as the variation of three physical states or conditions. (D.I. 607 at 2313)

32. The Boswell patent teaches a pulse-length modulation recording in which the recording is represented by "alternating spaces [i.e., two different physical conditions] [ ] hav[ing] variable lengths." (D.I. 607 at 2105) The recording path is comprised of these alternating physical states and "relative intervals between the transitions from one" physical state to another. (D.I. 607 at 2105)

33. As is apparent from its claims, the Boswell patent discloses a method of recording rather than a specific structure. In this regard, none of the Boswell patent claims contains a description of a particular structure. Some of the claims, however, cover a method using a specific recording medium. In particular, claim 6 covers a pulse-modulation method of recording involving a recording medium with "light transmitting properties." (DX 201 at 5, lns. 109–13)

Based on the specification, the Boswell patent teaches that such a recording medium may be disc-shaped. Furthermore, the Boswell patent teaches that a disc-shaped record would have a spiral recording path. (DX 201 at 4, lns. 1–2)

34. The Boswell invention does not specifically teach three-dimensional structures as features of the recording path. (D.I. 605 at 1617–22; D.I. 607 at 2071–73) The Boswell patent also does not teach three-dimensional replication techniques. (D.I. 605 at 1804–05) The only reference to three-dimensional recording features is the reference to a mechanical method of recording called the "Philips–Muller" system. (DX 201 at 4, lns. 15–17; D.I. 605 at 1805)

35. **The Boswell Patent and One of Ordinary Skill.**[12] One of ordinary skill in the art in the 1950s and 1960s would have assumed that Boswell's reference to "Philips–Muller" was really a reference to the Philips–Miller system of recording. (D.I. 607 at 2078, 2302–03)

36. This hypothetical person would have had to make several modifications to the Philips–Miller cutter in order to create discrete three-dimensional surface indicia on a disc-shaped recording medium. (D.I. 605 at 1627) In particular, a person of ordinary skill in the art would have had to (1) "lift the cutting element above the [recording medium] and [ ] pulse it down a finite depth" (D.I. 605 at 1630; D.I. 606 at 1782); (2) change the angle of the cutter (D.I. 605 at 1628); and (3) make "a blunt end in the middle" of the cutter. (D.I. 605 at 1628; D.I. 606 at 1782) The hypothetical person would have had the knowledge and ability to mechanically cut three-dimensional features of constant width in a recording medium to represent information. (D.I. 607 at 2318–20) This person also would have known how to make the appropri-

---

**11.** The court notes that while the Boswell patent specification refers to "pulse-width" modulation, DiscoVision's experts agree with DMI that Boswell teaches a "variable length" recording system. For example, DiscoVision's expert, Professor James U. Lemke, stated that "Boswell is talking about changing the recording signals that vary in **length**, such as a pulse-**width** modulation." (D.I. 607 at 2086) (emphasis added).

**12.** Since the definition of a person of ordinary skill in the art is to be determined as a matter of law, *see Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed.Cir.1985), it shall be addressed in the conclusions of law section of this opinion. The factual findings regarding infringement and validity, however, shall be made in the findings of fact section.

ate changes to the angle and shape of a Philips–Miller cutter. (D.I. 607 at 2307)

37. However, this person would have had to make significant modifications to pulse modulate the Philips–Miller cutter in order to create "discrete" surface indicia with constant widths. (D.I. 607 at 2314–15) Although the record indicates that a person of ordinary skill would have been able to cut three-dimensional features of constant width, there is no suggestion or teaching in the Philips–Miller article or the Boswell patent to create discrete surface indicia with constant widths. (D.I. 606 at 1782–84, 1786–89; D.I. 607 at 2076–79, 2314–17) Accordingly, there was no incentive for one of ordinary skill in the 1960s to make a recording using discrete, variable length surface indicia with constant widths. (D.I. 607 at 2316–17)

38. **The Dove Patent.** U.S. Patent No. 3,226,696 ("the Dove patent") issued on December 28, 1965, and is entitled "Data Storage and Retrieval System." (DX 11) The Dove invention "relates to high density and high speed data recording, storage, readout, and display methods and apparatus." (DX 11, col. 1, lns. 7–9) The Dove invention utilizes a "hole burning" technique to store information on a disc or other recording medium, such as a thin metallic film.[13] (DX 11, col. 2, lns. 36–41, col. 3, lns. 5–11, 56–68) The Dove patent also teaches that information may be stored by removing a "thin layer" or using a "chemical substance" or an "anti-etchant." (DX 11, col. 3, ln. 60–col. 4, ln. 10) The invention stores information by changing the physical properties of the recording medium. (DX 11, col. 3, ln. 66; D.I. 606 at 1632–34)

39. In particular, the Dove patent teaches the use of micron-sized holes or partial holes drilled into a recording medium by an electron or laser beam to represent stored information. (DX 11, col. 2, lns. 42–47, col. 4, lns. 24–31; D.I. 605 at 1634) The recording medium in which the holes are drilled has an opaque coating (e.g., a thin metallic film or "anti-echant"). (DX 11, col. 3, lns. 5–10, col.

4, lns. 1–11; D.I. 605 at 1632–33; D.I. 607 at 2051) The Dove Patent specification indicates that the recording medium may take the form of a "stack of discs." (DX 11, col. 4, lns. 12–14, figs. 5 and 6)

40. **The Scope of the Dove Invention.** The Dove invention covers a high-speed information storage and retrieval system that uses, among other things, a stack of disc-shaped records to store information. (DX 11, figs. 5 and 6) One of the objects of the Dove invention is "to provide an ultra-high density storage and readout method and apparatus which will increase storage densities and access time by several orders of magnitude over presently existing devices." (DX 11, col. 1, lns. 27–31) Another object of the Dove invention is to "provide an ultra-high density, ultra-high speed recording and reproducing system that can display the information contained therein by means of a static reproduction system." (DX 11, col. 1, lns. 34–38) This recording and reproducing system is designed so that "a variety of recording media can be used, and in which a highly flexible system of recording and reproducing may be employed." (DX 11, col. 1, lns. 54–57)

41. The Dove patent teaches that information may be represented on disc-shaped records as a series of micron-sized "holes" or "partial holes" that are spaced at regular intervals. (DX 11, col. 2, lns. 35–40, col. 3, lns. 60–72; D.I. 605 at 1634; D.I. 607 at 2052) The micron-sized holes may be produced by an electron beam, lasers, or "Maser." (DX 11, col. 2, lns. 24–25, 49–51, col. 3, lns. 42–50, col. 4, lns. 24–31; D.I. 606 at 1798) In the case of electron beam recording, there is "a tolerance of plus or minus 50 percent" in the size of the holes. (DX 11, col. 3, lns. 45–47; D.I. 607 at 2053)

42. The Dove invention teaches that these holes may be of uniform depth. (D.I. 607 at 2322) In the Dove invention, information is represented simply by the presence or absence of a hole. (D.I. 606 at 1801–02; D.I. 607 at 2043–45) There is no further disclo-

---

13. Although the Dove patent was not considered by the PTO, three other similar (hole-burning) patents were considered during the prosecution of the '297 patent. (D.I. 606 at 1807) Further-

more, the Dove patent is no more pertinent to the '297 patent than U.S. Patent No. 3,427,628 (PX 900), which concerns a thermoplastic recording method. (D.I. 606 at 1807–09)

sure of how information is represented by the holes. (D.I. 606 at 1902) The precise shape, size, and location of the hole is not disclosed by the patent specification. (D.I. 606 at 1801–02; D.I. 607 at 2043–45, 2052–53)

43. The Dove patent does not teach or suggest that information can be represented by holes of constant width and variable (elongated) length. (D.I. 607 at 2057–59, 2085–86) Furthermore, there is no teaching that the recording can be replicated using a stamping or embossing method. (D.I. 607 at 2064)

### (4) The Level of Ordinary Skill in the Art in the 1960s

44. One of ordinary skill in the art during the 1960s would have known that a spiral recording track on a disc can be formed such that each loop of the spiral is substantially parallel to the next loop. (D.I. 607 at 2113) This hypothetical person, however, would not necessarily have made the spaces between the loops substantially parallel. (D.I. 607 at 2113–14)

45. The Dove patent specification's reference to the use of an "anti-echant" as the opaque coating does not suggest to one of ordinary skill in the art in the 1960s to use "photoresist." [14] (D.I. 607 at 2061–62) one of ordinary skill in the art would have considered the "anti-echant" reference in the Dove patent to suggest the use of wax or paint since the specification refers to the "removal" of the anti-echant by an electron beam. (DX 11, col. 4, lns. 5–7) In contrast, the removal of photoresist would involve "exposure" and subsequent "development." (D.I. 607 at 2061–62)

46. One of ordinary skill in the pertinent art during the 1960s would have known that phase interference principles [15] can be used to read stored information on a transparent disc.[16] (D.I. 605 at 1703–05; D.I. 607 at

2131–32, 2165–66, 2205) In particular, this hypothetical person would have known that phase interference effects are necessary to generate a signal from a transmissive disc with micron-sized, three-dimensional features. (D.I. 607 at 2200–04, 2156) This person would have known that an interferometer coupled to an objective lens can be used to read the disc-shaped member disclosed in the '297 patent. (D.I. 600 at 209)

47. This person also would have known that phase interference principles can be used to read information reflectively off a record disc. (D.I. 605 at 1704; D.I. 607 at 2159) During the 1960s, it was well known that phase interference effects involve the pit depth of surface indicia. (D.I. 607 at 2132–33, 2205–06) It also was well known that, for phase interference purposes, the required pit depth differed depending on whether a disc was to be read reflectively as opposed to transmissively. (D.I. 605 at 1703–05) Accordingly, one of ordinary skill in the 1960s would have known how to vary a reading system to read discs either reflectively or transmissively. (D.I. 600 at 239–40; D.I. 607 at 2165–67)

48. One of ordinary skill in the 1960s would have known about photolithography techniques. (D.I. 607 at 2160) This person would have known how to create very small structures on a disc using lasers and photoresist. (D.I. 607 at 2162) Although designing the prototype disc would not have taken a long time, making one would have taken one of ordinary skill in the 1960s several months to a year. (D.I. 607 at 2163) Most of this time would have been spent on learning to operate and run the necessary equipment. (D.I. 607 at 2163) This type of work would have been considered "routine and straightforward." (D.I. 607 at 2163)

---

**14.** Photoresist is a photographically sensitive material as in photographic film. (D.I. 601 at 410)

**15.** A light beam may be manipulated to produce either "constructive" or "destructive" phase interference. (D.I. 600 at 216–33) When there is "destructive" phase interference, the light intensity drops. (D.I. 600 at 233) Information is retrieved from a record-disc by noting the variations in the intensity of a light beam as it impinges the surface indicia on a rotating disc.

**16.** DiscoVision's expert, Professor Mark Kryder, testified that a phase contrast microscope was invented in the 1930s. (D.I. 607 at 2165–66) Professor Kryder also noted that a device known as an "interferometer," which is based on phase interference principles, was known "long before 1965." (D.I. 600 at 209, 233)

49. Using photolithography techniques, one of ordinary skill in the 1960s also could have made a master disc.[17] (D.I.2161) From the master disc, this person could have made a stamper disc, which is used to produce CDs in high volume. (D.I. 600 at 175; D.I. 607 at 2161)

## C. DMI's CDs and Stampers

50. DMI's CDs store information on a disc in a series of "pits" and "lands" (i.e., interval portions) arranged in a spiral-shaped track. (PX 969A; PX 969B; PX 969F; D.I. 600 at 113–19; D.I. 558 at 5, 10–11) In DMI's CDs, the pits and lands are formed in the planar surface of a plastic disc-shaped substrate. (D.I. 600 at 118, 148–49, 156–58; D.I. 558 at 10–11) The side of the CD substrate containing the pits and lands is coated with a thin layer of reflective aluminum. (D.I. 600 at 119, 149) A protective layer of plastic coats the aluminum layer. (D.I. 600 at 119, 149) DMI's CDs store information in a digital format in which the pits and lands are of discretely variable lengths. (D.I. 600 at 165; D.I. 558 at 16)

51. The pits and lands of DMI's CDs are sequentially arranged in a plurality of substantially parallel information tracks. (D.I. 600 at 164; PX 969A; PX 969B) The information tracks on DMI's CDs are separated by intertrack portions of the planar surface area. (D.I. 600 at 165) The pits on DMI's CDs have the same width or substantially the same width. (D.I. 600 at 165; PX 969A; PX 969B) The intertrack portions of DMI's CDs have substantially the same width. (D.I. 600 at 165; PX 969A)

52. The widths of the information tracks on DMI's CDs are defined by the widths of the pits and lands. (D.I. 600 at 171–72; D.I. 601 at 367–88; PX 969A; PX 969B; PX 1981) In DMI's CDs, information is stored in the lengths of the pits and lands (i.e., surface indicia and interval portions). (D.I. 600 at 172–74) The intertrack portions of DMI's CD

substrates contain no information. (D.I. 600 at 160, 174–42; D.I. 606 at 1765–66)

53. DMI's CDs were designed to be read on conventional CD players using reflective phase interference principles. (D.I. 604 at 1376–79) In a phase interference system, a laser beam that is wider than the width of a pit is used to read information from the CD. (D.I. 604 at 1384–86, 1399) DMI spent several years optimizing the pit geometry in order to produce a "higher quality" product because the market for CDs is "very competitive." (D.I. 604 at 1387, 1399) After experimenting with different pit geometries, DMI determined that the optimal pit width for its CDs was one-third the width of the scanning spot and the optimal pit depth was 0.125 microns.[18] (D.I. 604 at 1389, 1394) DMI also determined that pits with sloped walls produced "very good tracking signals." (D.I. 604 at 1394) The sloped walls also allowed DMI to produce the CDs faster than CDs with straight walled pits. (D.I. 604 at 1395)

54. The method of reading a CD does not substantially change the CD's structure. (D.I. 600 at 204–18; PX 1981) The substrate under the protective coating and aluminum layer of a DMI CD has the same underlying structure as a disc that is played in a transmissive system. (D.I. 600 at 164–66)

55. DMI's stampers are disc-shaped members that have all the same features as DMI's CDs. (D.I. 600 at 167–69) DMI's stampers' surface indicia are complementary to the surface indicia of DMI's CD substrates. (D.I. 600 at 167–69) Information can be retrieved from DMI's CD stampers. (D.I. 600 at 170)

## D. The Constant Linear Velocity Patents

### (1) Overview of the Technology

56. A mastering machine is used to record information in the form of sequentially arranged pits and lands in a spiral track on a disc. (D.I. 601 at 410) In particular, a mastering machine utilizes a laser (or transduc-

---

17. In general, a master disc is made from a glass disc that is coated with photoresist. (D.I. 600 at 175) Information is recorded on the master disc by forming a pattern of pits and lands in the photoresist layer. (D.I. 600 at 175)

18. The Red Book indicates that pit depth should be less than 0.13 microns. (D.I. 604 at 1394)

er) to form the pits and lands in the photoresist layer of a glass master disc. (¶¶ 45, 48–49) [19] In order to record information on a disc effectively, two mechanical problems must be resolved: (1) the master disc must rotate in a precise and known manner; and (2) the disc must move relative to the laser in order to create a spiral track of pits and lands. (D.I. 601 at 410)

57. "Servo" systems are used to resolve these two problems. (D.I. 601 at 411) A servo system is a system designed to control some measure.[20] (D.I. 601 at 396) In a mastering machine, servo systems are used to control the rotation of the disc and the translation of either the laser or the disc relative to the other. (D.I. 601 at 411)

58. The speed at which a disc rotates is called "angular velocity" and can be expressed as revolutions per second (i.e., frequency). (D.I. 601 at 413–16) "Linear velocity" is the speed at which a particular distance is traversed and may be expressed as millimeters per second. (D.I. 601 at 416) With respect to a rotating disc, the linear velocity is measured at a specific radius. If the angular velocity of a disc is constant, the linear velocity increases as the radius increases. (D.I. 601 at 421–22) Accordingly, in order to maintain a constant linear velocity ("CLV"), the angular velocity must decrease as the radius increases. (D.I. 601 at 422–25)

59. By utilizing CLV in the mastering process, the recording density of discs may be increased. (D.I. 601 at 426–31) To produce a CLV recording, the mastering machine must be capable of performing two tasks: (1) the disc must rotate more slowly as the recording moves from the inner region of the disc to the outer region of the disc; and (2) the radial speed of the laser relative to the disc must slow down as the recording radius increases in order to maintain uniform spacing between tracks. (D.I. 601 at 434–35)

19. The indicated paragraphs refer to Part II, Findings of Fact.

20. DiscoVision's expert, Professor Ronald Lawes, explained that a familiar servo system is the

**(2) The '326 Patent**

60. U.S. Patent No. 4,228,326 ("the '326 patent") is entitled "System for Recording Information on a Rotatable Storage Disc in a Substantially Uniform Recording Density." (PX 2) The inventors of the '326 patent are listed as Wayne R. Dakin and Ludwig Ceshkovsky. (PX 2) It was issued on October 14, 1980. (PX 2) DiscoVision has been and still is the owner by assignment of all rights, title, and interests in, to, and under the '326 patent. (D.I. 633 at 3)

61. The '326 patent discloses a system for recording information on a disc using CLV to increase the recording density. (D.I. 601 at 435–38) The '326 abstract provides the following description of the invention:

> Method and apparatus for controllably rotating an information storage disc relative to a radially movable optical transducer, whereby information is recorded on the disc in a series of substantially circular and concentrically arranged information tracks. The angular velocity of the disc and the radial velocity of the transducer are controllably adjusted to be inversely proportional to the radius of the particular information track being recorded, whereby the track is moved at a constant linear velocity relative to the transducer and the successive tracks are equally spaced with respect to each other, and whereby a uniform information recording density over the surface of the disc is achieved.

(PX 2) The '326 patent specification explains that "the present invention is embodied in an improved apparatus, and a related method, for controlling the angular velocity of an information storage disc" having substantially parallel, spiral-shaped information tracks. (PX 2, col. 2, lns. 7–9) The patent specification describes the apparatus as having a "lens" (transducer), which is attached to a carriage that is "radially moveable relative to the disc." (PX 2, col. 2, lns. 42–44) The circuitry that produces the velocity signal is described as follows:

cruise control system in a car, which can control the speed of a car without any intervention. (D.I. 601 at 396–97)

The means for producing a measure of radius includes a potentiometer coupled to a moveable lens carriage and appropriately connected to produce an analog voltage signal that varies inversely with the radius of the selected track. This analog voltage signal is applied to a voltage controlled oscillator (VCO) to produce a velocity signal having a frequency substantially inversely proportional to the radius of the selected track.

The velocity signal produced by the VCO is applied to a spindle motor servo for synchronising the angular velocity of the spindle motor that rotates the disc with the instantaneous frequency of the velocity signal, whereby the disc is moved at a substantially constant linear velocity relative to the transducer.

(PX 2, col. 2, lns. 45–59) The circuitry is considered a "closed-loop system" because "as the transducer moves, it affects the potentiometer, which changes the input to the VCO,[21] which changes the frequency" signal. (D.I. 601 at 620)

62. The preferred embodiment of the '326 patent is an apparatus in which an "optical transducer 15" and "lens carriage 17" move in a radial direction while a disc rotates about its central axis at a precisely controlled angular velocity. (PX 2, col. 3, lns. 25–37, fig. 1; PX 2040) The apparatus includes a "lens carriage driver 37 . . . for moving the lens carriage 17 radially relative to the disc." (PX 2, col. 3, lns. 58–60) The lens carriage driver is connected to a "lead screw 19" which moves the "lens carriage 17" and the transducer radially. (PX 2, col. 3, lns. 35–39)

63. The apparatus also includes a means for producing a velocity signal with a frequency "inversely proportional to the radius of the information track being recorded." (PX 2, col. 4, lns. 25–27). Specifically, the velocity signal is produced by the VCO, "predominantly an analog device." (PX 2, col. 4, ln. 28, fig. 1; D.I. 601 at 611) The VCO receives a voltage control signal that is inversely proportional with the radius of the information track being recorded. (PX 2,

col. 4, lns. 30–35, fig. 1) An "amplifier circuit 43" connects the voltage control signal with the "lead screw 19." (PX 2, col. 4, lns. 30–35) The amplifier circuit is made up of analog components. (D.I. 601 at 610–12, 617–18) The components are: (1) a "conventional operational amplifier 47;" (2) a "fixed resistor 49;" and (3) a "potentiometer 45." (PX.2, col.4, lns.40–45) The potentiometer 45 is connected to the lead screw. (D.I. 601 at 614) The connection is such that the voltage control signal 41 changes depending on the physical location of the transducer 17. (D.I. 601 at 614; PX 2, fig. 1) Thus, for each radial position of the transducer, there is a unique voltage input to the VCO. (D.I. 601 at 613–14)

64. The apparatus also includes a "spindle motor servo 25" that controls the rotation speed of the disc. (D.I. 601 at 445–47; PX 2040; PX 2, col. 4, ln. 51—col. 5, ln. 2, fig. 1) In particular, the "spindle motor 51" provides the impetus for disc rotation. (D.I. 601 at 445; PX 2040) An "AC tachometer 53" is coupled to the spindle motor and produces "a tachometer signal having the frequency proportional" to the rotational speed of the spindle motor. (D.I. 601 at 446; PX 2, col. 3, lns. 55–59) A "phase detector 55" compares the tachometer signal with the "velocity signal" from the VCO and produces a "control signal proportional to the phase difference." (PX 2, col. 4, lns. 60–65; D.I. 601 at 446–47) The control signal is transmitted to a "phase and amplitude compensator 63" and "an amplifier 67." (PX 2, col. 4, lns. 65–68) "The output of the amplifier is coupled . . . to the spindle motor 51 to appropriately control" the speed at which the disc is rotated. (PX 2, col. 4, ln. 68 – col. 5, ln. 2; D.I. 601 at 446–47)

65. **Claims of the '326 Patent.** Claims 2 and 8 of the '326 patent are at issue in this case. Claim 2 covers an "[a]pparatus for recording information on an information storage disc, wherein the information is recorded in [a] plurality of substantially circular and concentrically arranged information tracks." (PX 2, col. 6, lns. 36–39) The claimed apparatus is described as comprising:

---

21. A "VCO" or voltage controlled oscillator is a device that converts a voltage input signal into a

frequency output signal. (D.I. 602 at 706)

transducer means movable radially relative to

the disc to be positioned in a prescribed relationship relative to a selected one of the information tracks; means for producing a velocity signal having

a frequency substantially inversely proportional to the radius of the selected track;

motor means for rotating the disc;

tachometer means coupled to said motor means for producing a tachometer signal having a frequency proportional to the angular velocity of said motor means; and

phase detector means for comparing the

respective phase angles of the tachometer signal, and for producing a control signal indicative of the phase difference thereof, said control signal being coupled to said motor means to appropriately control its angular velocity, whereby the selected information track is moved at a substantially constant linear velocity relative to said transducer means and a substantially uniform information recording density is achieved.

(PX 2, col. 6, lns. 41–61) Claim 8 is directed to

[a] method of driving a motor to controllably rotate an information storage disc relative to a transducer, wherein said disc has a plurality of substantially circular and concentrically arranged information tracks, and wherein said transducer is radially movable relative to said disc to be positioned in a prescribed relationship relative to a selected one of the information tracks.

(PX 2, col. 8, lns. 30–34) The method in claim 8 comprises the following steps:

producing a velocity signal in accordance with the radial position of the transducer, said velocity signal having a frequency substantially inversely proportional to the radius of the selected information track;

producing a tachometer signal having a frequency proportional to the angular velocity of the motor; and

comparing the respective phase angles of the tachometer signal and the velocity signal, to produce a control signal for coupling to the motor, to controllably adjust the respective phase angles, whereby the selected information track is moved at a prescribed constant linear velocity relative to the transducer.

(PX 2, col. 8, lns. 38–54)

### (3) Prior Art for the '326 Patent

66. **The Bringol Patent.** U.S. Patent No. 3,826,965 ("the Bringol Patent"), entitled "Constant Tangential Velocity Motor Control for a Disc Recording System," issued on July 20, 1974, (DX 211) The Bringol patent was not cited as a prior art reference in the prosecution history of the '326 patent.[22] (D.I. 602 at 867) The Bringol invention concerns a disc recording system in which the transducer head maintains a "constant tangential velocity" as it moves "radially along the disc." (DX 211, col. 1, lns. 6–11) The Bringol patent specification notes that "[i]f the disc is maintained at a constant angular velocity" during the recording process, the "recording density is lowered ... as the [transducing] head moves radially outward from the center of the disc." (DX 211, col. 1, lns. 19–31) The Bringol invention claims to have solved this problem by using a "linear potentiometer" connected to the transducing head and to the "disc driving DC motor" such that the "motor drive is decreased as the head nears the outermost portion of the disc." (DX 211, col. 1, lns. 32–44) The Bringol invention is generally described as

a disc recording system ... including a motor control system ... as the prime mover of the recording disc. A transducer attached to a carrier movable along a radius of the disc is utilized for reading information from the disc or recording information onto the disc. A linear potentiometer is fixedly mounted along a radius of the disc and includes a moveable wiper connected for movement with the transducer carrier. The potentiometer is connected in the feedback loop of a high gain amplifier function generator which produces an out-

22. DiscoVision, however, cited a Bringol French counterpart patent in the file of the '326 patent

after the '326 patent issued. (DX 24 at production numbers 19668–682)

put voltage that is hyperbolic with respect to the position of the wiper along the length of the linear potentiometer. This hyperbolic output voltage is applied to a DC[23] motor for providing substantially constant tangential velocity of the portion of the disc adjacent to the transducer. (DX 211, col. 2, lns. 14–31)

67. **The Scope of the Bringol Patent.** The Bringol patent teaches a system of recording information on a disc using a transducer that is radially moveable and a motor that rotates the disc at a CLV with respect to the transducer. (D.I. 602 at 867–71, 872, 994–95) The Bringol patent also teaches that a potentiometer can be used to generate a signal that corresponds to the actual radial position of a transducer recording on an information disc. (D.I. 602 at 869–71)

68. The Bringol patent teaches a magnetic recording system in which approximately 30 seconds of information can be recorded on a disc. (D.I. 602 at 920, 954) In comparison, a CD typically can hold 74 minutes of information. (D.I. 602 at 921) The Bringol patent does not teach a CLV system that is capable of high-density information storage/recording. (D.I. 602 at 923) In particular, the Bringol patent does not teach the use of a very fine track pitch as would be needed in a high density recording, such as a CD.[24] (D.I. 602 at 921–24)

69. **The Dakin Reissue Patent.** U.S. Patent No. Re. 32,431 ("the Dakin reissue patent") is a reissue of a prior patent filed on November 16, 1978, the same day the '326 patent was filed.[25] (DX 210) The Dakin reissue patent is entitled "System for Rotating an Information Storage Disc at a Variable Angular Velocity to Recover Information Therefrom at a Prescribed Constant Rate."

The abstract of the Dakin reissue patent describes the invention as a "[m]ethod and apparatus for recovering information at a substantially constant rate from a rotatable information storage disc." The specification explains that

[s]ince known prior apparatus for recovering information from rotatable information storage discs operate to rotate the disc only at a constant angular velocity relative to a transducer, they are generally incapable of recovering information from discs of the type having [ ] [a CLV] recording density.

(DX 210, col. 2, lns. 20–27) Accordingly, the Dakin reissue patent describes an apparatus and method for recovering information by rotating an information storage disc at a CLV relative to a transducer that is radially moveable. (DX 210, col. 2, lns. 28–36, col. 3, lns. 10–23)

70. The Dakin reissue patent specification describes the means for rotating a disc at a constant linear velocity as follows:

The coarse speed control means preferably comprises a potentiometer mechanically coupled to the transducer means, which is movable radially relative to the disc. An electrical signal produced by the potentiometer is substantially proportional to such radius and is coupled to the means for producing the composite speed control signal, which, in the preferred embodiment comprises a voltage-controlled oscillator (VCO). The composite speed control signal produced by the VCO has a frequency substantially inversely proportional to the radius of the selected track, and is coupled to a conventional servomechanism for rotating a disc at a corresponding angular velocity.

---

**23.** "DC" refers to "direct current." (D.I. 618 at 56)

**24.** The Bringol patent also does not teach the use of a VCO to produce a "frequency signal" in achieving a CLV recording. (DX 211, figs. 1, 2, and 3; D.I. 602 at 873–74, 919) It does not teach the use of a "feedback circuit" or "spindle [motor] servo" as part of the means for rotating the disc at a constant linear velocity relative to the transducer head. (D.I. 602 at 874, 919–24) The patent does not teach the use of "tachometer means" or a "phase detector" for use in control-

ling the rotation speed of the disc. (D.I. 602 at 874, 919–20)

**25.** The Dakin reissue patent is not itself considered prior art to the '326 patent since they share the same filing date. As the court understands DMI's invalidity arguments, it has proffered the Dakin reissue patent to establish that a spindle servo mechanism was known to those of ordinary skill in the art, who would have used such knowledge in combination with the relevant prior art. (D.I. 613 at 48–59; D.I. 621 at 20–26; D.I. 602 at 875–76)

(DX 210, col. 3, lns. 11–23) The Dakin reissue patent specification includes a figure of the means for rotating the information storage disc. (DX 210, fig. 3) The patent specification describes this figure as "a simplified block diagram of a prior art apparatus for rotating the video disc [ ] at a constant angular velocity to recover the video signal therefrom." (DX 210, col. 4, lns. 16–19)

71. The "conventional servo [ ] mechanism" of the Dakin reissue patent is identical to the "spindle motor servo" described in the '326 patent. (DX 210, fig. 3) In particular, the servo mechanism of the Dakin reissue patent utilizes a phase detector and an AC tachometer in the same manner as described in the '326 patent. (DX 210, fig. 3)

#### (4) The '860 Patent

72. U.S. Patent No. 4,190,860 ("the '860 patent"), entitled "Digital Method and Apparatus for Rotating an Information Storage Disk," was issued on February 26, 1980. (PX 2036) The inventors of the '860 patent are listed as Frank J. Somers and John S. Winslow. (PX 2036) Since the grant of the '860 patent, DiscoVision has been the owner by assignment of all the rights, title, and interests in, to, and under the '860 patent. (D.I. 633 at 3)

73. The '860 patent discloses "an improved apparatus and method" for rotating an information storage disc about its central axis" at a CLV relative to the radial position of an optical transducer. (PX 2036, col. 2, ln. 56 – col. 3, ln. 2) The improvements that the '860 patent discloses fulfill the need for a CLV system that is less susceptible to "non-linearities and drifts of various elements in the apparatus, and without necessitating substantial initial calibration procedures." (PX 2036, col. 2, lns. 49–54)

74. The '860 patent discloses an apparatus that has a radially moveable transducer. (PX 2036, fig. 1) CLV is achieved in the '860 patent by reducing the speed of the lens carriage and spindle motors as the transducer moves away from the center of the disc. (PX 2036, col. 3, lns. 5–60, fig. 1) The '860 invention utilizes the same spindle motor servo and a similar lens carriage drive as the '326 invention. (PX 2102, fig 1; D.I. 601 at 470–71)

75. The differences between the '860 and '326 inventions relate to the means for producing the velocity signal that controls the rotation speed of the spindle motor. The '860 invention utilizes a device called a "radius register 21" which measures and stores the radial location of the transducer head as it moves outward from the center of the disc. (PX 2036, col. 3, lns 3–5, fig. 1) The radius register 21 is connected to a "magnitude comparator 35" (or frequency divider). (PX 2036, col. 3, lns. 32–48, fig. 1) Another device, called a "crystal oscillator," is used to send a "clock signal" to a "counter 31," which is also connected to the magnitude comparator 35. (PX 2036, col. 3, lns. 6–13, fig. 1) The magnitude comparator 35 continuously compares the inputs from the counter and the radius register. (D.I. 602 at 863–64) When the values from the counter and the radius register are the same, the magnitude comparator resets the counter. (D.I. 602 at 863–64) The counter, magnitude comparator, radius register, and divider circuits divide the clock signal to produce a velocity signal for the lens carriage and the spindle motors. (D.I. 602 at 863–64; PX 2036, col. 3, lns. 33–68) The velocity signal sent to the spindle motor is substantially inversely proportional to the radial location of the transducer. (PX 2036, col. 3, lns. 42–68) The velocity signal sent to the lens carriage motor, however, has a "frequency proportional to the desired radial velocity." (PX 2036, col. 3, lns. 49–55)

76. **Claims of the '860 Patent.** Claims 1, 16, and 21 of the '860 patent are at issue in the instant case. Claim 1 covers an apparatus for rotating an information storage disc with a CLV relative to a radially moveable transducer. (PX 2036, col. 8, lns. 29–35) The apparatus is described as comprising the following limitations:

means for producing a digital measure of the radius of the particular information track selected;

oscillator means for producing a clock signal having a substantially constant frequency;

means, responsive to the radius measure and the clock signal, for producing a disc velocity signal that has an

instantaneous frequency corresponding to the frequency of the clock signal

divided by the radius measure; and means for adjusting the angular velocity of the information disc according to the instantaneous frequency of the disc velocity signal.

(PX 2036, col. 8, lns. 38–49) Claim 16 covers a "method of rotating an information storage disc" with a CLV relative to a radially moveable transducer. (PX 2036, col. 10, lns. 55–64) The claimed method is described as comprising the following limitations:

producing a digital measure of the radius of the particular information track selected;

generating a clock signal having a substantially constant frequency;

dividing the frequency of the clock signal by the measure of radius to produce a disc velocity signal; and

adjusting the angular velocity of the information disc according to the instantaneous frequency of the disc velocity signal.

(PX 2036, col. 10, ln. 65 – col. 11, ln. 6) Claim 21 covers a method as defined in claim 16 and including the following additional steps:

producing a transducer velocity signal having an instantaneous frequency propor-

tional to that of the disc velocity signal; and

adjusting the radial velocity of the transducer relative to the information disc according to the instantaneous frequency of the transducer velocity signal.

(PX 2036, col. 11, lns. 42–49)

### (5) Additional Prior Art for the '860 Patent[26]

77. **The Katsuoka Patent.** U.S. Patent No. 3,983,369 ("the Katsuoka patent"), entitled "Digital Hyperbolic Function Generator," was issued on September 28, 1976. (DX 205) The Katsuoka patent was not cited in the prosecution history of the '860 patent. (D.I. 602 at 896) The Katsuoka patent discloses an "improved hyperbolic function generator." (DX 205, col. 1, lns. 49–51) The hyperbolic function generator is described as comprising:

a setting circuit the setting of which is varied with the number n of second clock signals applied at a fixed time interval, said setting circuit producing said setting in a binary code, a modulating circuit for frequency modulating first clock signals of a fixed frequency in response to said setting to produce third clock signals the period of which is proportional to

$$1 + n + \sum_{r=1}^{n} r_1$$

and a converter circuit for producing a voltage corresponding to said number of said third clock signals, whereby a hyperbolic function of polygonal line approximation with time as a variable is generated while a stable operation with regard to the change in ambient temperature is assured. (DX 205, col. 1, lns. 50–68) The circuit disclosed in the Katsuoka patent receives two inputs: (1) a fixed frequency signal; and (2) a trigger signal. (DX 205, col. 2, lns. 17–24) When a trigger signal is received, the circuit

is reset to a fixed output voltage value. (DX 205, col. 2, lns. 17–24) Since the voltage value is inversely proportional to the amount of time elapsed since the trigger signal was received by the circuit, this output voltage value decreases over time. (DX 205, col. 1, lns. 48–68) This process is repeated when the circuit receives another trigger signal. (DX 205, col. 2, lns. 17–24)

78. DiscoVision's expert, Professor Ronald Lawes, explained that the Katsuoka patent discloses "a one over T [time] relation-

---

26. The Bringol patent and the spindle servo mechanism in the Dakin reissue patent discussed

above are also prior art for the '860 patent.

ship." (D.I. 602 at 960–62) Professor Lawes explained further that "T" is not related to "R," radius, but is rather related to "the square of the radius" or "R squared." (D.I. 602 at 962)

79. **Scope of the Katsuoka Patent.** The Katsuoka patent specification explains that "analog hyperbolic function generator[s] ... [have] drawback[s] in that it is difficult to provide a function generator of constant characteristic[s] because of mismatching in the diode characteristics and the adjustment of the generator is difficult." (DX 205, col. 1, lns. 24–29) The Katsuoka patent also explains that the operation of an analog hyperbolic function generator is "unstable because of the temperature dependency of the diodes and the resistors." (DX 205, col. 1, lns. 30–31) Accordingly, the Katsuoka patent discloses a "digital" hyperbolic function generator as an improvement on the analog version. (DX 205, col. 1, ln. 47 – col. 2, ln. 5) According to DMI's expert, Dr. Paul Day, the Katsuoka patent discloses "a general purpose" digital hyperbolic function generator that is not limited to any specific application. (D.I. 602 at 927–28) Dr. Day explained that this invention is simply "a building block ... for achieving a function." (D.I. 602 at 928)

80. Dr. Day acknowledged that the Katsuoka patent does not discuss the application of the digital hyperbolic function generator to the recording of data. (D.I. 602 at 916) Indeed, the Katsuoka' patent does not discuss its applicability to "disc media, recording, or playback." (D.I. 602 at 916) Dr. Day also acknowledged that the Katsuoka invention does not provide for the input of radial position. (D.I. 602 at 917) Dr. Day conceded that the Katsuoka patent has nothing to do with radial position. (D.I. 602 at 917) Indeed, the Katsuoka invention must be modified in order for radial inputs to be added. (D.I. 602 at 917–18) Dr. Day also conceded that the Katsuoka patent does not teach or suggest any modifications to include radial

inputs or produce a one (1) over radius (R) function. (D.I. 602 at 917–18)

### (6) Level of Ordinary Skill in the Art at the time of the '326 and '860 Patents[27]

81. One of ordinary skill in the art at the time of the '326 and '860 inventions would have known about high density storage discs recorded at a constant angular velocity ("CAV"). (PX 2, col. 1, lns. 12–52) Accordingly, this hypothetical person would have known about the equipment used to master CAV storage discs. The person would have known about VCOs and their operation. (D.I. 602 at 995) In particular, he or she would have known that a VCO could be used to convert a DC voltage into an AC (alternate current) voltage. (D.I. 602 at 879, 995) Furthermore, a spindle motor servo mechanism utilizing a phase detector and AC tachometer (i.e., a "phase lock loop" circuit) was well known to those of ordinary skill in the art at the time of the '326 and '860 inventions. (D.I. 602 at 874–79, 957; DX 210)

82. One of ordinary skill in the art at this time also would have known that a CLV recording increases the recording density on a storage disc. (D.I. 602 at 925) This hypothetical person would have known that a potentiometer connected to a transducer provides the necessary one (1) over radius (R) relationship to achieve a CLV recording. (DX 211) This person also would have known that a digital hyperbolic function generator was an improvement over an analog hyperbolic function generator. (DX 205)

### (7) DMI's Mastering Machines[28]

83. **The Version One Machines.** DMI's MM1–MM3 mastering machines are called version one mastering machines. (D.I. 633 at 4) The version one machines rotate a master disc at a CLV. (D.I. 633 at 4) The team leader who designed and built the version one machine is a former DMI employee, Alan Hamersley.[29] (D.I. 602 at 724) In de-

---

27. As noted above, the '326 patent and the '860 patent were filed on the same day: November 16, 1978. (PX 2; PX 2036)

28. DMI designated nine mastering machines as MM1–MM9. (D.I. 633 at 4)

29. The court notes that DiscoVision's expert, Professor Lawes, testified at trial that he (1) has only seen a video of DMI's version one mastering machine; (2) never actually inspected a compact disc mastering machine in person; and (3) never designed a mastering machine. (D.I. 601 at 626;

signing the version one machines, Hamersley wanted "a very short optical path, and a very stable optical path." (D.I. 602 at 738) Accordingly, the version one machines have a stationary transducer. (D.I. 602 at 738) Instead of a radially moveable transducer, the version one machines have a turntable that is translated under a stationary transducer on an air bearing. (D.I. 602 at 730) The assembly for these machines weighs about 550 pounds; the turntable weighs about 150 pounds. (D.I. 602 at 731; DX 198a–c) The weight of the overall machine was intended to minimize the effects of vibrations during the recording process. (D.I. 602 at 731, 745–46) The rotating turntable also contributes to the stability of the machines during the recording process. (D.I. 602 at 732)

84. According to Hamersley, another reason for using a stationary transducer was to facilitate alignment of the optical system. (D.I. 602 at 744) Hamersley explained that a system with a moveable transducer "requires more alignment and maintenance to keep the system aligned and recording properly than a system that does not." (D.I. 602 at 744–45)

85. The drive (translation) assembly of the version one machines is controlled by a microprocessor. (D.I. 602 at 748–49) The microprocessor receives information from a "home sensor" and a translation "programmable frequency generator." (D.I. 602 at 749; DX 448) With this data, the microprocessor calculates the necessary steps for the translation of a CD during the recording process. (D.I. 602 at 749–52) The microprocessor sends out a signal to the translation pro-

grammable frequency generator. (D.I. 602 at 749–50) The translation programmable frequency generator produces a signal called "translation steps." (D.I. 602 at 767; DX 448) The translation steps are sent not only to a "translation stepper motor driver," but also back to the microprocessor. (D.I. 602 at 749, 767–68) The "microprocessor counts the steps in the signal and uses the data to compute the current location of the turntable underneath the recording head." (D.I. 602 at 767–68) The microprocessor also sends out a direction signal to the translation stepper motor driver. (D.I. 602 at 749, 767; DX 448)

86. The rotation assembly also is controlled by the microprocessor. (D.I. 602 at 749) The microprocessor makes a calculation and sends out numerical frequency data to a "rotation[al] programmable frequency generator." (D.I. 602 at 755–66, 757; DX 448) The rotational programmable frequency generator contains a "digital divider," a "multiplexer," a "digital latch," a "digital-to-analog converter," a "low-pass filter," and an "[o]perational amplifier." (D.I. 602 at 760, 767) The rotational programmable frequency generator receives the numerical frequency data and then sends out a frequency signal (or "rotation reference frequency") corresponding to that number. (D.I. 602 at 757–59; DX 449) According to Hamersley:

The data that comes in[to] [the rotational programmable frequency generator] will correspond to a frequency on the output. And every increment of [the numerical frequency data] will produce an exact incre-

D.I. 602 at 970) During trial, Professor Lawes admitted that he had only seen mastering machines on video. (D.I. 602 at 970) He acknowledged that the first time he had ever seen the drive assembly of the version one machine was during trial. (D.I. 601 at 630) When asked about the basis for his understanding of how one of DMI's mastering machines works, Professor Lawes explained:

I know what the parts are to do. I have read a selection of the vast material that describes the [M]M–1. I believe I have a working understanding of the essential parts that affect the CLV discussion. That is what I base my information on. It's based on documents and documents that I've quoted from in the expert report.

When I felt that I had sufficient understanding, not in all details, but when I had an

understanding that would enable me to assess the questions about digital measures, whether they were oscillators and so on and so forth, at that point when I felt comfortable I had an understanding, that's the point at which I stopped.

(D.I. 601 at 654–55) With respect to Hamersley's testimony, Professor Lawes stated that, "as a general statement," Hamersley's testimony as to how DMI's mastering machines work is accurate. (D.I. 602 at 964) Professor Lawes testified that

it would be possible that Mr. Hamersley and I would disagree how something worked.

[Ninety-nine] times he would be correct and on one occasion I might be right.

(D.I. 602 at 964) According to Professor Lawes, Hamersley's testimony did not conflict with any of his opinions. (D.I. 602 at 964–65)

ment of change in the frequency of the output. If we were to put a value that is halfway between zero and 4,095, it would produce a frequency that is exactly halfway between the end point frequencies from the device.

(D.I. 602 at 759) The rotation reference frequency is sent to a "rotation servo and driver." (D.I. 602 at 762–63) Inside the rotation servo and driver, the rotation reference frequency is compared to a "tach frequency" to control the rotational speed of the turntable. (D.I. 602 at 763) In addition, the operational amplifier produces a reference voltage that is sent to the translation programmable frequency generator. (D.I. 602 at 760)

87. The translation system in the version one machines is considered an "open-loop" system because there is no feedback to the microprocessor about the location of the drive assembly relative to the transducer. (D.I. 601 at 621; D.I. 602 at 679–83, 752–53) The rotation assembly, however, is considered a "closed-loop" system "[b]ecause there is an actual servo" and "there is feedback" within the system to speed up or slow down the rotation of the disc. (D.I. 602 at 763–64) The rotational frequency generator consists of both analog and digital components. (D.I. 602 at 762) The version one machines do not use a potentiometer. (D.I. 601 at 615) The version one machines also do not contain "analog component[s]" that "directly measure[ ] the position of the disc relative to the transducer." (D.I. 601 at 615)

88. DMI made three different version one machines (MM1–MM3). (D.I. 602 at 772–74) The second machine is identical to the first version one machine. (D.I. 602 at 772) The third machine incorporated some improvements. DMI made the third machine smaller and improved the optical system. Another improvement concerned the translation system. In this third machine, a "linear motor" system replaced the stepper motor assembly. (D.I. 602 at 773) Hamersley explained that a linear motor system is

a speaker coil of wire along a magnet structure that with magnetism can drive the system in and out, so it was truly a frictionless system at that time.

(D.I. 602 at 773)

89. **The Version Two Machines.** DMI's MM5–MM9 mastering machines are called version two mastering machines. (D.I. 633 at 4) Version two mastering machines are similar to the version one machines with some changes to the electronics and programmability. (D.I. 602 at 776) Like the version one machines, DMI's version two machines have fixed transducers with radially moveable rotating turntables. (D.I. 602 at 777) The version two machines also have the linear motor that was added to the third version one machine, as well as improved optics. (D.I. 602 at 764–68)

90. Gordon Rudd [30] designed the "control electronics and software that operates" DMI's version two machines. (D.I. 602 at 798) There are two "frequency synchronizers" in each version two machine. (DX 227) The frequency synchronizers generate the reference signals for the turntable rotation and the turntable translation. (D.I. 602 at 799) The two frequency synchronizers are substantially identical to each other. (D.I. 602 at 801; DX 227) The rotation frequency synchronizer is composed of a divider, a phase comparator, a programmable filter, a VCO, a multicontrolled oscillator, and a multiplier. (D.I. 602 at 801) The turntable translation frequency synchronizer has a divider, a phase comparator, a loop (or fixed) filter, a VCO, and a multiplier. (D.I. 602 at 799–801) The filters and VCOs for both frequency synchronizers are analog devices. (D.I. 602 at 802) The divider and multiplier for both frequency synchronizers are digital components. (D.I. 602 at 802) Accordingly, the control electronics for the version two machines are hybrid analog/digital systems. (D.I. 602 at 802)

---

30. Mr. Rudd worked as an outside design consultant for DMI during the development of the version two mastering machines. (D.I. 602 at 797–99) He is an electronics design consultant. (D.I. 602 at 797) He owns two businesses, Design Science and Clover Systems. (D.I. 602 at 796–97) Design Science is a consulting business that is involved primarily with product development and system design. (D.I. 602 at 797) Clover Systems is a test equipment business. Its primary business is to "manufacture and test equipment for CDs." (D.I. 602 at 797)

91. Since the VCOs in the circuitry of the version two machines are analog, they are subject to nonlinearities and drift. (D.I. 602 at 803) The inherent inaccuracies of these analog components were addressed by designing a "closed loop servo" that "provides control feedback, which compensates for the errors." (D.I. 602 at 804) According to Mr. Rudd, the programmable filter or VCO cannot be easily replaced by digital components. (D.I. 602 at 803–04)

92. In producing the appropriate disc velocity signal, the divider in the rotation frequency synchronizer receives an input from the microprocessor. (PX 2057) The input is "a number that is proportional to the radius divided by the linear velocity." (D.I. 602 at 806) The version two machines store a "digital measure of radius" in a 32 bit counter. (D.I. 601 at 547) A clock signal with a substantially constant frequency is produced from a 2.785 megahertz "fixed clock." (PX 2057; D.I. 601 at 549) The radius data from the microprocessor and the fixed clock signal are then loaded into the divider. (PX 2057) The signal from this divider is sent to the phase comparator. (PX 2057) It then passes through a low pass filter and a VCO. (PX 2057) Another divider sends a signal back to the phase comparator. (PX 2057)

93. The version two machines have a "commercial motor servo drive," a "disc motor," and a "tachometer." (PX 2057; D.I. 601 at 554–55) These components comprise the means for adjusting the angular velocity of the disc according to the instantaneous frequency of the disc velocity signal. (D.I. 601 at 555)

94. The version two machines have an "interrupt-driven microprocessor." (D.I. 601 at 650–51) The software manual for these mastering machines explains the "CLV Interrupt" feature as follows:

> Constant Linear Velocity is achieved by slowing down the turntable speed at regular intervals as the cutting radius increases. These changes are initiated by interrupts generated at regular radius intervals. The radius interval between interrupts can be set by the user. The interrupt handler calculates the new turntable speed and sets the TT reference frequency accordingly.

(PX 215 at 21; D.I. 601 at 638, 650)

95. **The Philips Mastering Machine.** DMI's MM4 mastering machine is called the Philips mastering machine. (D.I. 633 at 4) The Philips mastering machine uses a radially moveable transducer to produce a CLV recording on an information storage disc. (D.I. 601 at 577; D.I. 602 at 902) In producing a CLV recording, the Philips machine generates a clock signal having a substantially constant frequency. (D.I. 601 at 579–80; D.I. 602 at 903–04) The machine also has means for adjusting the angular velocity of the information disc according to the instantaneous frequency of the disc velocity signal. (D.I. 601 at 581–82; D.I. 602 at 901–02)

96. In the Philips machine, there are two 25 megahertz fixed clocks. (PX 2090; D.I. 601 at 566–68) One of the fixed clocks sends a fixed clock signal to a divider ($\div N$). (D.I. 601 at 567–69) The divider also receives a numerical frequency signal from a microprocessor that is proportional to the radial location of the transducer relative to the disc (i.e., "radius signal"). (PX 2090; D.I. 601 at 568–69) The Philips machine uses a microprocessor to "compute[ ] a lue for radius." (D.I. 601 at 559) The frequency signal that is sent out of the divider is inversely proportional to the radius signal (or one over the radius). (D.I. 601 at 569–72) Another clock signal is sent to another divider ($\div M$). (PX 2090; D.I. 601 at 569–70) This divider ($\div M$) also receives a similar numerical frequency signal from the microprocessor and sends out a varying frequency signal to the transducer motor, which moves the transducer appropriately. (D.I. 601 at 569–71)

97. The Philips machine uses an open-loop system to generate the frequency signal that is inversely proportional to the radius signal. (D.I. 602 at 975–76) In particular, the microprocessor in the Philips machine uses information related to the radial location of the transducer to produce both the transducer and disc velocity signals. (PX 2090) Professor Lawes explained the operation of the microprocessor and the use of radius information as follows:

[T]his microprocessor is actually connected to another computer, just a general purpose computer. And when a particular form of mastering is done, information is sent from that computer basically to say, this is what I'm doing.

The machine is calibrated in a number of ways and is now ready to start mastering.

The microprocessor, one of the pieces of information that the microprocessor is given is the internal radius at which it wishes to start. This morning I said 25 millimeters was the inner radius. This computer out here will say to this computer over here, You are starting at radius 25.

It will also say, Oh, by the way, I want you to write until—I gave the example this morning—I want you to write until you get to 60 millimeters. . . .

It is saying to this system here (indicating), Here is the radius at which I wish you to start at. And here is the information you need in order to stop.

Now, we know in this instance—the way it's done, it conveys the information that if it is doing a CD with a 1.6 micron spacing, the information that's given will enable this microprocessor to work out that it's being requested to do 1.6 microns.

So there is still a calculation which I have not discussed, but in order to understand this machine from the bottom up, again, clock, divider, information, radius information calculated from information given by a system controller computer.

On the basis of that information, it will now decide, within the microprocessor, this is the radius that you start at, this is the next number you have, this is the next number you have. And in the way that I've described for a number of these machines now, the divider will give this frequency, and this frequency exactly in the sequence they're required. . . .

The motor is rotating at a certain speed. But that is not the speed at which the disc is rotating. The reason for that, and it's not shown here, is that there is a complex gear wheel. . . .

. . . [T]he number of times that the disc motor interrupts the computer is not actually twice per disc of the CD, it's actually twice the motor, which is rotating the CD and that—so you get a lot more of these pulses than you do rotations of the disc. . . .

And so the information coming out of here is basically saying to the computer . . . update your calculation. Update your calculation. Update your calculation.

(D.I. 601 at 572–74) Dr. Day stated that the Philips machine uses an "implied radius to implement the CLV function" as opposed to a "direct measure of radius." (D.I. 602 at 903) According to Dr. Day, both the '860 patent and the Philips machine use "implied radius" information in the CLV function. (D.I. 602 at 906)

### E. The Bailey Invention

#### (1) Overview of the Technology

98. **Storing Information on a CD.** In storing information on a CD, the information (e.g., music) is first converted from an analog signal into a digital representation.[31] (D.I. 603 at 1036) A binary system of "bits" (i.e., 1s and 0s) is one technique of representing an analog signal in a digital format. In a binary system, "code blocks" (i.e., a combination of bits) represent the analog signal. (D.I. 603 at 1036) The number of bits in a code block determines the total number of code block variations in a particular binary system.[32] The digital representation of the analog signal results in a "bit stream" (i.e., a sequence of code blocks). (D.I. 603 at 1036; 1280–81)

99. The bit stream is recorded on a CD in the form of a succession of optically detectable "marks" (pits) and "spaces" (lands) arranged in a spiral track using a modulation system. (D.I. 603 at 1038; D.I. 604 at 1280–

31. Sound is most commonly represented by an analog signal or "waveform" (i.e., amplitude over time). The waveform of music can be converted into a digital format by a process called digital sampling. Through digital sampling, a digital representation of the analog sound wave is obtained by assigning numerical values to the amplitude of the waveform at a desired frequency. (D.I. 447 at 52–54)

32. For example, if a code block were limited to two bits, the total number of code block variations would be four (i.e., 00, 01, 10, and 11).

81, 1298) A modulation system involves changing the bit stream into "some form of physical symbols, and then subsequently . . . chang[ing] those physical symbols back into a sequence of binary digits." (D.I.1281) In modulating a bit stream, a laser is used to form a succession of marks and spaces on a rotating disc. (D.I. 603 at 1036–37) In the recording process, a binary digit (e.g., a "1") acts as a "switch" that turns the laser off and on as the bit stream is sent to the laser. (D.I. 603 at 1037) As the laser is turned off and on in accordance with the digits in the bit stream, a succession of marks and spaces are created that correspond to the information to be recorded. (D.I. 603 at 1037)

100. **Modulation Encoding Systems.** In recording information onto a disc, modulation encoding systems may be used to achieve specific advantages. (D.I. 603 at 1038) For example, a coding step can be used to increase the data density that can be stored on a disc. (D.I. 603 at 1025, 1039–41; D.I. 604 at 1298–99) Modulation encoding is also used to prevent errors or correct errors in the playback process. (D.I. 603 at 1025, 1039–40; D.I. 604 at 1298–99)

### (2) The '490 Patent

101. U.S. Patent No. 5,373,490 ("the '490 patent"), entitled "System for Recording Digital Information in a Pulse–Length Modulation Format," issued on December 3, 1994. (PX 1010) The '490 patent was filed on January 12, 1994 but is a continuation of a series of applications that relate back to July 16, 1980. (PX 1010, col. 1, lns. 6–17; D.I. 613 at 9) The inventor listed on the '490 patent is Jack H. Bailey. Since its grant, DiscoVision has been and still is the owner by assignment of all the rights, title, and interests in the '490 patent. (D.I. 633 at 4)

102. The abstract of the '490 patent explains that the invention is "[a]n improved system for recording and playing back digital information in a special pulse-length modulation format on a disc-shaped record." (PX 1010) The '490 invention is an improved recording system because digital information is represented by varying the lengths of the

marks as well as the lengths of the spaces between each mark. (PX 1010, col. 1, ln. 65 – col. 2, ln. 10) By representing digital information in this manner, more information can be recorded in the same amount of space on a CD, i.e., at a higher density. The '490 patent specification explains this improved recording system as follows:

> The present invention is embodied in a system for recording and playing back digital information on a record medium, in which the information is stored in a succession of spaced marks of discretely-variable lengths. The length of each mark is representative of a separate one of a succession of multi-bit binary code blocks. In accordance with the invention, the spaces between successive marks also have discretely-variable lengths representative of separate blocks in the succession of code blocks. Digital information is thereby recorded on the record with a yet higher recording efficiency.

(PX 1010, col. 1, ln. 65 – col. 2, ln. 10) The '490 patent specification explains that in recording a video signal, the signal is first digitized. (PX 1010, col. 2, lns. 15–16)

> The digitized video signal is then arranged in a succession of code blocks of the same or mixed lengths, and a binary modulation signal is formed having transitions in state determined in accordance with the successive code blocks. In the preferred embodiment, each code block includes four binary bits, and the successive states of modulation have sixteen possible discrete durations.

(PX 1010, col. 2, lns. 18–24)

103. The '490 patent specification discloses, as the preferred embodiment, a modulation system involving the conversion of four-bit code blocks of original binary bits into specific lengths of marks or spaces.[33] In figure four of the specification, sixteen code blocks are shown to correspond to sixteen different lengths of a mark or space. Figure four is reproduced below:

---

**33.** As Professor Howe stated, "[t]he ['490] patent is about modulation, not about coding." (D.I. 604 at 1280)

| CODE BLOCK | HEXADECIMAL EQUIVALENT | MARK (OR SPACE) LENGTH |
|---|---|---|
| 0000 | 0 | 1.0L |
| 0001 | 1 | 1.1L |
| 0010 | 2 | 1.2L |
| 0011 | 3 | 1.3L |
| 0100 | 4 | 1.4L |
| 0101 | 5 | 1.5L |
| 0110 | 6 | 1.6L |
| 0111 | 7 | 1.7L |
| 1000 | 8 | 1.8L |
| 1001 | 9 | 1.9L |
| 1010 | A | 2.0L |
| 1011 | B | 2.1L |
| 1100 | C | 2.2L |
| 1101 | D | 2.3L |
| 1110 | E | 2.4L |
| 1111 | F | 2.5L |

(PX 1010, fig. 4) According to figure four, sixteen four-bit code blocks of original binary bits are converted into a specific length of either a mark or a space. For example, the code block 0000 is always represented by a mark (or space) of length 1.0L. In explaining figure four, the '490 patent specification refers to the lengths in the "MARK (OR SPACE) LENGTH" column as "pulse lengths":

> FIG. 4 is a table showing one suitable relationship between sixteen possible 4–bit code blocks and the **time durations** for the corresponding **pulses** output by the two **pulse**-width modulators 35 and 37. It will be observed that the possible **pulse lengths** vary in uniform steps between a minimum length of 1.0L and a maximum length of 2.5L.

(PX 1010, col. 3, ln. 65 – col. 4, ln. 3) (emphasis added). As is apparent from the patent specification, the '490 invention functions in a recording apparatus as well as in a playback apparatus. (PX 1010, col. 2, lns. 35–40) The '490 patent specification discloses block diagrams of both a recording apparatus and a playback apparatus. (PX 1010, figs. 1 and 2)

104. In the recording apparatus disclosed in the '490 patent, a baseband video signal is converted into a digital signal through an "analog-to-digital converter 21." (PX 1010, col. 3, lns. 44–45, fig. 1) The digital signal is sent to a "formatter 27" which, among other things, converts the digital signal into "successive four-bit code blocks." (PX 1010, col. 3, lns. 50–51) The code blocks are then sent to a "buffer 31" which transfers them "one by one" to a "MARK pulse-width modulator 35" and a "SPACE pulse-width modulator 37." (PX 1010, col. 3, lns. 51–55) The patent explains that "the two pulse-width modulators operate, in alternating fashion, to produce output pulses having discretely-variable time durations corresponding to the particular code blocks applied to their respective input terminals." (PX 1010, col. 3, lns. 55–59) These output pulses are sent to a

> combiner device 39 for producing the modulation signal coupled over line 41 to the intensity modulator 17, in accordance with the successive pulse-length modulated pulses received over lines 43 and 45 from the MARK and SPACE modulators 35 and 37, respectively.

(PX 1010, col. 4, lns. 10–16) The recording device also includes a "radially-moveably objective lens," a "spindle motor," and a "writing laser 13." (PX 1010, col. 3, lns. 14–22) The "intensity modulator 17" is used for producing a beam of light that is modulated in accordance with the digital modulation signal from the combiner 39. (PX 1010, col. 3, lns. 15–22)

105. The playback apparatus is described as including a "reading laser 53 for producing a reading beam of light 55 having a substantially uniform intensity." (PX 1010, col. 5, lns. 5–10) The beam is focused on the rotating disc and produces a "reflected beam of light 59 that is modulated in intensity in accordance with the recorded pattern of marks on the disc." (PX 1010, col. 5, lns. 5–10) A "detector 61" receives this beam of light and produces an electric signal that corresponds to the modulated intensity of the reflected beam of light. (PX 1010, col. 5, lns. 22–23) The electric signal is then sent to a

MARK pulse-width demodulator 65 and a SPACE pulse-width demodulator 67, **which measure the lengths of the successive marks and spaces, respectively, and determine the particular code blocks they represent.**

(PX 1010, col. 5, lns. 20–29) (emphasis added). The patent specification continues to explain the operation of the playback apparatus as follows:

Each demodulator can conveniently include a linear ramp generator that is initiated and terminated by the detected edges of each mark (or space), along with an analog-to-digital converter for converting the peak value of the ramp to the corresponding four-bit code block. The apparatus further includes a decoder 69 for interleaving the successive four-bit code blocks supplied on lines 71 and 73 from the MARK and SPACE demodulators 65 and 67, respectively.

(PX 1010, col. 5, lns. 34–37) The sequence of code blocks (or bit stream) generated from the decoder 69 is sent to a "deformatter device 77, which de-compresses the data using conventional techniques, converting it back to substantially its original digital format." (PX 1010, col. 5, lns. 38–41) The "decompressed video data" is sent from the deformatter 77 to a "digital-to-analog converter 81, which reconstructs the original analog baseband video signal." (PX 1010, col. 5, lns. 44–48)

106. **The '490 Patent Claims.** Claims 3, 6, 9, and 11 are relevant to the case at bar.[34] Claim 3 provides:

An optical disc comprising:

a substantially disc-shaped record medium having a recording surface including a succession of areas representing alternating marks and spaces thereon;

wherein the marks and spaces have discretely— varied lengths which are indicative of recorded signals and which vary between a minimum length and a maximum length, the maximum length being greater than double the minimum length, and a first length of any mark or space and a second length of any other

mark or space is less than said minimum length;

said succession of marks and spaces including portions of a predetermined length which represent encoded portions of a succession of original binary bits, which are encoded using a coding system whereby every portion of original binary bits encodes into an encoded portion which unambiguously represents said every portion of original binary bits, in a way such that said encoded portion includes information allowing decoding into said every portions without additional information about portions other than the portion being decoded.

(PX 1010, col. 6, ln, 1 – col. 7, ln. 22) Claim 6 provides: "A disc in claim 3 wherein each said portion of said succession of original binary bits includes the same number of binary bits." (PX 1010, col. 7, lns. 35–37) Claim 9 uses similar language as in claim 3, except the claim concerns an "optical record medium." (PX 1010, col. 7, ln. 44) The optical recording medium in claim 9 is described as

a substantially disc-shaped record medium having a recording surface which has its optical characteristics altered in a plurality of specified areas to represent information recorded thereon; wherein

a region of said recording surface having a first state of said optical characteristics is representative of a mark and a region of said recording surface having a second state of said optical characteristics is representative of a space;

each said mark region and each said space region has a discretely varied length and represents different code parts;

the alternating mark regions and space regions have lengths which are limited to being between a minimum length and a maximum length, the maximum length being greater than double the minimum length, and which are classified into one of a plurality of discrete lengths which vary in uniform increments and which are between said minimum length and said maximum length, a minimum incre-

34. DiscoVision alleges that DMI infringes claims 6 and 11.

ment being less than said minimum length, portions of the succession of alternating mark regions and space regions representing encoded portions, encoded using a coding system whereby every portion of original binary bits which represent the recorded information encoded into an encoded portion which unambiguously represents said every portion of original binary bits in a way such that said encoded portion includes information allowing decoding into said every portion without additional information about portions other than the portion being decoded.

(PX 1010, col. 7, ln. 44 – col. 8, ln. 7) Claim 11 provides "[a] record medium as in claim 9 wherein each said portion of said succession of original binary bits includes the same number of binary bits." (PX 1010, col. 8, lns. 11–13)

107. The '490 patent discloses a one-to-one relationship between each specific length of a mark or space and a specific multi-bit code block of original binary bits. (D.I. 607 at 2000–01) Therefore, the length of the space or mark (in the proper sequence, a function of the "decoder") is the only information needed to determine the succession of original binary bits. (D.I. 604 at 1299–1300) There is no need to obtain information about the lengths of adjacent marks or spaces (or the adjacent code block) in order to determine the code block that a particular mark or space represents. (D.I. 604 at 1298–1300; D.I. 606 at 1904–05)

### (3) Prior Art

108. **The Doi Article.** An article entitled "A Long Play Digital Audio Disc System" ("the Doi article")[35] was presented at an Audio Engineering Society convention in Brussels, Belgium between March 13–16, 1979. (DX 5; D.I. 604 at 57) The Doi article was subsequently revised in September 1979 and published in December 1979. (DX 5; D.I. 604 at 1357) The Doi article discloses a

video disc recording technique called 3PM (three position modulation) that increases the recording density of a record disc. (DX 5) In a 3PM coding system, three-bit user data is converted into a six-bit code block. The code sequence of six-bit code blocks is constrained such that all ones (1s) are separated by at least two zeros (0s). (DX 5; D.I. 606 at 1896) In order to achieve these constraints, a "bit flipping" step must be performed which requires knowing the adjacent six-bit code blocks in the code sequence or bit stream. (D.I. 606 at 1896–99)

109. The signal of a 3PM code sequence is recorded on a disc using an "NRZI" representation.[36] (D.I. 604 at 1366) In an NRZI representation, the ones (1s) act as the "switch" or "signal transitions" for the writing laser. (D.I. 604 at 1286–87, 1366) These signal transitions define the boundaries of the marks and spaces on the disc. (D.I. 604 at 1367)

110. Since the 3PM code sequence is constrained such that all ones (1s) are separated by at least two zeros (0s), the resulting marks and spaces have "discretely varied lengths" and have a maximum and minimum length variation. (D.I. 604 at 1366–68) This type of coding system is also known as a "fixed rate run length limited code" ("fixed RRL code"). (D.I. 604 at 1300–25) In a fixed RRL code, "there will be instances in which there will be a transition within the space of [ ] one original user data." (D.I. 604 at 1308) Thus, information about the preceding code block is required to determine the relationship between the length of a mark or space and the particular code block it represents. (D.I. 604 at 1308; D.I. 606 at 1904)

### (4) The '490 Information Disclosure Statement

111. On March 16, 1990, DiscoVision filed an "Information Disclosure Statement" ("IDS") in connection with U.S. Patent Serial No. 782,156.[37] (DX 67) The IDS explains the

---

**35.** One of the authors of the article is Tosui T. Doi of the Sony Audio Technology Center, Tokyo, Japan. (DX 5)

**36.** An NRZI representation is a means of representing binary digits as an electrical waveform. (D.I. 604 at 1282, 1286–87)

**37.** U.S. Patent Serial Number 782,156 was filed on October 2, 1985, but subsequently was abandoned. (PX 1010) The '490 patent specification cites to this patent serial number as one of a number of related U.S. patent applications.

Doi article and appears to distinguish the 3PM coding system. The IDS also appears to distinguish another coding system used with CDs called "EFM (eight to fourteen modulation)." (DX 67 at 2) The IDS provides:

The herein-cited reference to Doi et al [ ] discusses a recording technique known as 3PM (three point modulation).... A similar recording technique for compact disc technology is known as EFM (eight to fourteen modulation), wherein an 8–bit sample is converted into a 14–bit word to provide at least two 0's between each "1" as in the example in Doi et al. EFM may be considered to be a species of the generic 3PM technique....

Conventional disc recording techniques have used frequency modulation in recording data on discs, wherein the data blocks have been used to modulate the frequency of a carrier, and the FM carrier is recorded..... **Such systems do not involve the direct recording of the digital format of the data.** Hence, the new improvements provided in the present invention are not suggested by such techniques.

There is nothing in the Doi et al publication to indicate that the 3PM technique utilize[s] anything other than frequency modulation for recording purposes..... **In the claims of the subject application, each mark o[r] space has a discrete length associated with a prescribed number of binary bits in each code block.**

(DX 67 at 2–3) (emphasis added).

### (5) DMI's CD Coding System

112. **EFM.** DMI employs the EFM system in recording its CDs. (D.I. 603 at 1088) The EFM system is part of the CD industry standard and is described in detail in the *Philips/Sony Rainbow Books.* (PX 72) The EFM system converts eight-bit code blocks of original binary bits into fourteen-bit code blocks by using a lookup table. (D.I. 603 at 1093–94; D.I. 604 at 1328) When transforming an eight-bit code block into a fourteen-bit code block, the EFM system adds an internal constraint so that there is a maximum and minimum number of zeros (0s) between any

two ones (1s) in a fourteen-bit code block. (D.I. 604 at 1313) In the EFM system, the maximum number of zeros (0s) in a fourteen-bit code block is ten, while the minimum number of zeros (0s) is two. (D.I. 604 at 1313)

113. The next step in the EFM system involves adding three additional bits, called merging or linking bits, to the end of each fourteen-bit block. (D.I. 603 at 1095–97; D.I. 604 at 1328–30) This creates seventeen-bit code blocks. One reason for adding merging bits to a fourteen-bit code block is to ensure that a sequence of fourteen-bit code blocks remains constrained by the rule that any two ones (1s) must be separated by a minimum of two zeros (0s) or a maximum of ten zeros (0s). (D.I. 604 at 1326–30) For example, if one fourteen-bit block ends with a one (1) and the next fourteen-bit block begins with a one (1), the merging pattern "000" is used to maintain at least two zeros (0s) between any two ones (1s) in the sequence of code blocks. The result is a sequence of seventeen-bit code blocks that conforms to the same internal restraints imposed on individual fourteen-bit code blocks.

114. Synchronization bits are then inserted between some of the seventeen-bit code block sequences. (D.I. 603 at 1097) These synchronization bits enable the reading laser to determine the boundaries of each seventeen-bit code block in the sequence of code blocks. (D.I. 603 at 1097–98; D.I. 604 at 1350)

115. The sequence of seventeen-bit code blocks and the synchronization bits is converted into marks and spaces on a disc using the NRZI recording technique. (D.I. 603 at 1098) The resulting lengths of the marks and spaces do not always correspond in a one-to-one relationship with the original eight-bit code blocks. (D.I. 603 at 1098–99; D.I. 604 at 1318–19) In other words, DMI's CDs contain marks, spaces, and mark-space combinations that "straddle" two different original eight-bit code blocks. (D.I. 603 at 1098; D.I. 606 at 1319; PX 2015A) Consequently, additional synchronization information is required in order to determine whether a particular length of a mark or space represents a particular eight-bit code block. (D.I. 604 at

1350) Accordingly, the EFM system is considered a fixed RRL limited, or ambiguous, code. (D.I. 604 at 1346)

## III. CONCLUSIONS OF LAW

### A. Legal Standards for Infringement

■■■ 1. **Literal Infringement.** Section 271(a) of the Patent Act provides:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a). The Federal Circuit has set forth a two-step analysis for determining whether there is infringement:

> First, the claims must be correctly construed to determine the scope of the claims. Second, the claims must be compared to the accused device.

*Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed.Cir.1998). "To establish literal infringement, a plaintiff must demonstrate that every limitation in the claim is literally met by the accused device." *Id.* In other words, literal infringement exists when the claim, as construed by the court, reads on the accused device exactly. *See Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405 (Fed.Cir.1996). Infringement may not be avoided simply by adding features or components not required by the claims. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 865 (Fed.Cir.1985), *overruled on other grounds*, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed.Cir.1998). Plaintiff has the burden of demonstrating by a preponderance of the evidence that "every limitation of the claim is literally met by the accused device." *Kahn*, 135 F.3d at 1476.

■■■ 2. **Literal Infringement For Means–Plus–Function Claims.** Section 112, ¶ 6 of the Patent Act provides the parameters within which means-plus-function claims can be drafted and construed. *See* 35 U.S.C. § 112, ¶ 6. Claim limitations "may be expressed as a means ... for performing a specified function without the recital of structure, material, or acts in support thereof." *Id.* "When so expressed, 'such claim [limitations] shall be construed to cover the corresponding structure, material, or acts described in the specification **and equivalents thereof.**'" *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1018 (Fed.Cir. 1998) (J. Plager, additional views) (quoting 35 U.S.C. § 112, ¶ 6) (emphasis in original).

> "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure."

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir.1998) (quoting *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir.1987)); *see also O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed.Cir.1997); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1547 (Fed.Cir.1997). Section 112, ¶ 6 "acts as a restriction" on the scope of a claim limitation because it "rules out the possibility that any and every means which performs" a claimed function is literally satisfied by the claim limitation. *Pennwalt Corp.*, 833 F.2d at 934.

■■■ 3. A determination of the claimed function and the corresponding structure is a matter of claim construction. *See Chiuminatta*, 145 F.3d at 1308. The test to determine equivalence under § 112, ¶ 6 is "whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial."[38] *Id.* at 1309 (citing *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed.Cir.1993)). An insubstantial change is something that "adds nothing of significance to the structure, material, or acts disclosed in the patent specification." *Valmont Indus., Inc.*, 983 F.2d at 1043.

---

**38.** The court notes that the Federal Circuit has yet to address whether the determination of equivalents under § 112, ¶ 6 is a question of law or fact. *See Chiuminatta*, 145 F.3d at 1309 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 n. 8 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)).

**336**

■■■ **4. Infringement Under the Doctrine of Equivalents.** If an accused device does not literally infringe a patent claim, infringement may still be established under the doctrine of equivalents. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1045, 1051, 137 L.Ed.2d 146 (1997). Under this doctrine, infringement is established if "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Id.* at 1045; accord *Kahn,* 135 F.3d at 1478. "The doctrine of equivalents is applied to each individual element of a claim, not to the invention as a whole." *Kahn,* 135 F.3d at 1478. Unlike the infringement analysis under § 112, ¶ 6, infringement under the doctrine of equivalents requires only that the accused device have an "equivalent function" to the patent claim. *See Chiuminatta,* 145 F.3d at 1310.

■■■ **5.** Nevertheless, the determination of "equivalence" under the doctrine of equivalents is similar to the equivalence analysis under § 112, ¶ 6, as both "apply[ ] similar analyses of insubstantiality of the differences" between the accused device and the claim elements or disclosed structure. *See id.; see also Dawn Equip. Co.,* 140 F.3d at 1015. In some instances, the "function-way-result test" may also be used to establish equivalence under the doctrine of equivalents. *See Dawn Equip. Co.,* 140 F.3d at 1015–16. "Under the function-way-result test, one considers whether the element of the accused device at issue performs substantially the same function, in substantially the same way, to achieve substantially the same result." [39] *Id.* at 1016. Regardless, equivalence must be determined at the time of infringement, not at the time the patent was issued. *See Warner–Jenkinson Co.,* 117 S.Ct. at 1053. Finally,

> a skilled practitioner's knowledge of the interchangeability between claimed and accused elements is not relevant for its own sake, but rather for what it tells the factfinder about the similarities or differences between those elements. Much as the per-

spective of the hypothetical "reasonable person" gives content to concepts such as "negligent" behavior, the perspective of a skilled practitioner provides content to, and limits on, the concept of "equivalence."

*Id.* at 1053. "The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1424 (Fed.Cir.1997).

■■■ **6. Claim Construction.** The principles of claim interpretation are well established in the law. It is the court's "power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir. 1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Courts are directed to consider three sources to ascertain the meaning of a claim: (1) the literal language of the claim; (2) the patent specification; and (3) the prosecution history. When interpreting the words of the claim, the court should "ascribe [to the words] their ordinary meaning unless it appears the inventor used them otherwise." *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995).

■■■ **7.** Claim construction begins always with the claim language, which defines the scope of the claim. *See York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572 (Fed.Cir.1996). In analyzing claim language, the court must employ "normal rules of syntax," *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1553 (Fed.Cir.1997), for "[a] claim must be read in accordance with the precepts of English grammar." *In re Hyatt,* 708 F.2d 712, 714 (Fed.Cir.1983). The court must ascribe to any technical term used in a claim "the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst*

---

**39.** The Supreme Court has commented that while this test "may be suitable for analyzing mechanical devices, it often provides a poor framework for analyzing other products or processes." *Warner–Jenkinson,* 117 S.Ct. at 1054.

*Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996).

■ 8. The words of the claim must be construed in the light of the specification, whose "description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman,* 52 F.3d at 979.

> The specification acts as a dictionary when it expressly defines terms used in the claims **or when it defines terms by implication.** As we have repeatedly stated, "[c]laims must be read in view of the specification, of which they are a part." The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always relevant to the claim construction analysis. Usually, it is dispositive; **it is the single best guide to the meaning of a disputed term.**

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) (emphasis added) (internal citations omitted).

■ 9. The last source of intrinsic evidence relevant to claim interpretation is the prosecution history of the patent, if it has been made part of the record.

> This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims....
>
> \* \* \* \* \* \*
>
> The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as

expert testimony, would make this right meaningless.

*Id.* at 1583 (internal citation omitted).

■ 10. Claim construction of a disputed term is an "objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman,* 52 F.3d at 986. Extrinsic evidence is generally not needed since "ideally there should be no 'ambiguity' in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history." *Id.* The patent law requires patents to be written using **"full, clear, concise, and exact terms"** as well as particularly to point out and distinctly claim the subject matter that the applicant regards as his invention. *Id.* (quoting 35 U.S.C. § 112) (emphasis in original). Furthermore, the patent applications are reviewed by patent examiners who are presumed to have some expertise in the art. *See id.* "If the patent's claims are sufficiently unambiguous for the PTO, there should exist no factual ambiguity when those same claims are later construed by a court of law in an infringement action." *Id.*

■ 11. The role of extrinsic evidence, accordingly, is a limited one.

> A judge is not usually a person conversant in the particular technical art involved and is not the hypothetical person skilled in the art to whom a patent is addressed. Extrinsic evidence, therefore, may be necessary to inform the court about the language in which the patent is written. But this evidence is not for the purpose of clarifying ambiguity in claim terminology. It is not ambiguity in the document that creates the need for extrinsic evidence but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed.

*Id.* In other words, extrinsic evidence "may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Id.* at 980. "It is useful 'to show what was then old, to distinguish what was new, and to aid the court in the construction of the patent.'" *Id.* (quoting *Brown v. Pip-*

*er,* 91 U.S. 37, 41, 23 L.Ed. 200 (1875)). "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Id.* at 981.

### B. Infringement Analysis

■■■ 12. **The '297 Patent: Claim Construction.** The court has already construed the relevant claim language for claims 1, 10, and 13 of the '297 patent. (D.I. 558 at 9–12) As is apparent from the patent, claims 10 and 13 are dependent on claim 1.[40] With respect to claim 1, the court construed the word "surface" in the phrase "surface indicia" to refer to the surface that accepts information from a master die. (D.I. 558 at 10–11) The phrase "variable lengths" was construed to cover the storage of both analog and digital information. (D.I. 558 at 11–12) Finally, the phrase "substantially uniform width" was construed to allow "for minor variations in [ ] width" of the information tracks on the claimed disc. (D.I. 558 at 11) With respect to claim 10, the court construed the limitation "adapted for transferring surface indicia" as limited to the use of embossing techniques.[41] (D.I. 558 at 9)

13. **The '297 Patent: Infringement.** The court's memorandum opinion on DiscoVision's motion for summary judgment on the '297 patent resolved several contested issues. (D.I.567) In particular, the court concluded that DMI's CDs: (1) are disc-shaped members with surface indicia integral to the planar surface of the disc-shaped members; and (2) have surface indicia of variable lengths that represent stored information. (D.I. 567 at 11, 16) The only issue that remained for trial was whether information was

stored in the intertrack region of DMI's CDs. (D.I. 567 at 19) In other words, the only triable issue of fact with respect to infringement of the '297 patent was "whether DMI's CDs contain 'information tracks' that are defined by the widths of the discrete surface indicia." (D.I. 567 at 15)

■■■ 14. DMI's CDs were designed to be played on conventional CD players using reflective phase interference principles. (¶ 53) Accordingly, DMI's CDs are coated with a thin layer of reflective aluminum. (¶ 50) Underneath the aluminum layer is a CD substrate that has all the same features as those described in claim 1. (¶ 50–52) In reviewing the record, the court concludes that DiscoVision has proven by a preponderance of the evidence that the widths of the information tracks on DMI's CDs are defined by the widths of the pits and lands. (¶ 52) DiscoVision presented convincing evidence that the method of reading a CD is irrelevant to the structure claimed in claim 1. In particular, no information is stored in the intertrack region of a DMI CD. (¶¶ 52–53) DMI's stampers have essentially the same structure as DMI's CDs. (¶ 55)

15. Accordingly, all of the elements in claim 1 read exactly onto DMI's CDs and stampers. The court concludes that DMI's CDs and stampers infringe claim 1 of the '297 patent. The court further concludes that DMI's CDs and stampers infringe claim 13 of the '297 patent since DMI's CDs are considered information storage media. DMI's stampers also infringe claim 13 since the stored information is retrievable. (¶ 55)

■■■ 16. The court concludes, however, that DiscoVision did not present sufficient

**40.** Both claims 10 and 13 provide in part "[t]he disc-shaped member as set forth in claim 1." (PX 30, col. 5, lns. 28–49, col. 6, lns. 26–28) Claim 10 is directed to a disc-shaped member that "is adapted for transferring surface indicia to a body of disc material." (PX 30, col. 6, lns. 16–18) Claim 13, is directed to a disc-shaped member that "comprises an information storage medium." (PX 30, col. 6, lns. 26–28)

**41.** The court recognizes that while claim 10 is directed to a disc-shaped member "adapted for transferring surface indicia," (PX 30, col. 6, lns. 16–18), claim 12 is specifically directed to a disc-shaped member "as set forth in claim 10, where-

in said member is adapted for transferring surface indicia ... in an embossing process." (PX 30, col. 6, lns. 22–24) For the reasons set forth in the court's earlier memorandum order (D.I. 558 at 7–9), the court declines to apply the doctrine of claim differentiation. "[A]lthough different claims should be presumed to cover different inventions, if a claim will bear only one interpretation, similarity [with another claim] will have to be tolerated." *Laitram Corp. v. Morehouse Indus., Inc.,* 143 F.3d 1456, 1462 (Fed.Cir.1998) (quoting *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed.Cir.1991)) (internal quotations omitted).

evidence of infringement for claim 10. (D.I. 600 at 131, 169, 170, 245–51) It is undisputed that DMI uses an "injection molding" technique in manufacturing its CDs. (D.I. 600 at 245–51) Since claim 10 has been interpreted by the court to be limited to disc-shaped members adapted for transferring surface indicia using embossing techniques, the court holds that DMI is entitled to judgment of noninfringement with respect to claim 10 of the '297 patent. *See J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,* 106 F.3d 1563, 1570–71 (Fed.Cir.1997) (finding no proof of infringement under adopted claim construction required reversal of judgment of infringement).

17. **The '326 Patent: Claim Construction.** Claim 2 of the '326 patent covers an "apparatus for recording information on an information storage disc." (¶ 65) Claim 2 is written in a means-plus-function without definite structure format, pursuant to 35 U.S.C. § 112, ¶ 6. Accordingly, claim 2 is limited "to the means specified in the written description and equivalents thereof." This court already has construed claim 2 to be limited to structures where the "transducer means" is "moveable." (D.I. 558 at 12) The court also has construed claims 2 and 8 to be limited to structures using analog components that actually measure the radial position of the transducer to generate a "velocity signal." (D.I. 558 at 15)

■ 18. **The '326 Patent: Infringement.** DiscoVision asserts that DMI's version one mastering machines infringe claims 2 and 8 of the '326 patent. Claim 2 of the '326 patent contains five elements, two of which are at issue presently: (1) the trans-

ducer means; and (2) the means for producing a velocity signal.[42] DiscoVision argues that, despite the court's claim construction, DMI's version one machines infringe, either literally or under the doctrine of equivalents, claims 2 and 8.[43] (D.I. 612 at 3, 35–39) .

19. The record indicates that a DMI version one machines differ from the claimed invention since they have: (1) stationary transducers; and (2) different circuitry for producing a velocity signal. (¶¶ 83–88) DiscoVision argues that these differences do not preclude a finding of infringement because they are "insubstantial." The court, however, concludes that DiscoVision failed to carry its burden of persuasion on this issue. The record indicates that the differences between a moving transducer and a stationary one relate to the alignment of the optical path and the maintenance of the mastering machine. (¶¶ 83–84) As this court noted above, "a skilled practitioner's knowledge of the interchangeability between claimed and accused elements is not relevant for its own sake, but rather for what it tells the factfinder about the similarities or differences between those elements." *Warner–Jenkinson Co.,* 117 S.Ct. at 1053. Although DiscoVision presented an expert's opinion that it is insubstantial whether the transducer or the disc moved radially, DiscoVision's expert did not explain why he believed these differences were insubstantial. Indeed, he acknowledged that there are "many problems" with moving the parts of an optical system. (D.I. 601 at 518–19, 529–33, 625)

20. With respect to the second contested claim element (means for producing a veloc-

**42.** DMI apparently does not dispute that the remaining three elements in claim 2 read on the version one machines. These claim elements are: (1) motor means; (2) tachometer means; and (3) phase detector means. It also is clear that DMI's version one mastering machines have the same function as the claimed apparatus, i.e., to produce a CLV recording on an information storage disc.

**43.** With respect to claim 2, the court notes that the analysis for literal infringement and infringement under the doctrine of equivalents converge, since the claim elements at issue are § 112, ¶ 6 "mean-plus-function" claims. In particular, the analysis for infringement under either doctrine rests on similar equivalence inquiries. *See Chiu-*

*minatta,* 145 F.3d at 1310 (stating that, "[al]though an equivalence analysis under § 112, ¶ 6[ ] and the doctrine of equivalents are not coextensive …, their tests for equivalence are closely related"). For a further explanation of the relationship between § 112, ¶ 6 and the doctrine of equivalents, see Laurence Pretty & Janene Bassett, *Reconciling Section 112, Paragraph 6 With the Doctrine of Equivalents in the Wake of* Warner–Jenkinson Co. v. Hilton Davis Chemical, 489 PLI/Pat 359 (September 1997). Claim 8 of the '326 patent is a method claim. Given the court's claim construction, infringement of claim 8 can be established only under the doctrine of equivalents.

ity signal), the court concludes that Disco-Vision failed again to carry its burden of persuasion. The record indicates that the version one machines use different circuitry to produce the velocity signal than the circuitry. disclosed in the '326 patent. Unlike the '326 apparatus, the version one machines do not use a potentiometer or other analog components to directly measure the position of the disc relative to the transducer. (¶ 87) The version one machines instead have an "open-loop" translation system with a microprocessor, whereas the '326 specification discloses a "closed-loop" translation system without a microprocessor. (¶¶ 61, 85–87) DiscoVision failed to present evidence adequately explaining why these differences are insubstantial.[44] Consequently, the court concludes that DiscoVision failed to prove by a preponderance of the evidence that DMI's version one mastering machines infringe claims 2 and 8 of the '326 patent.

21. **The '860 Patent: Claim Construction.** Claims 1, 16, and 21 are at issue in this case. Claim 1 of the '860 patent covers an apparatus used to make a CLV recording on an information storage disc. As already construed by this court, claim 1 is limited to structures with a moveable transducer.. (D.I. 558 at 12) The apparatus described in claim 1 is written in a means-plus-function format pursuant to 35 U.S.C. § 112, ¶ 6. The claimed apparatus includes "means, [ ] for producing a disc velocity signal." (PX 2036, col. 8, lns. 42–43) Based on the specification and the claim language, the court construed claim 1 to be limited to structures that use digital components to produce the desired velocity signal. (D.I. 558 at 15–16)

■ 22. Claims 16 and 21 of the '860 patent are method claims. (¶ 76) Claim 16 is directed to a method of rotating an information storage disc relative to a transducer, "wherein said transducer is radially moveable relative to said disc." (PX 2036, col. 10, lns. 55–59) The method claimed in claim 16 is described as comprising four steps: (1) producing a digital measure of the radius; (2) generating a clock signal; (3) dividing the frequency of the clock signal; and (4) adjusting the angular velocity of the information disc. (PX 2036, col. 10–11, lns. 65–66) The method in claim 21 is the same method described in claim 16 with two additional steps: (1) "producing a transducer velocity signal having an instantaneous frequency proportional to that of the disc velocity signal"; and (2) "adjusting the radial velocity of the transducer relative to the information disc according to the instantaneous frequency of the transducer velocity signal." (PX 2036, col. 11, lns. 45–50)

23. Given the court's earlier claim construction with respect to claim 1, claims 16 and 21 are limited to methods using a moveable transducer. For the same reasons the court limited claim 1 to structures that use digital components, the court construes claims 16 and 21 as methods that require the use of digital components.[45] In particular, the court agrees with DMI that fair notice concerns should limit the '860 patent claims to a purely digital CLV system.

24. With respect to the Philips mastering machine, the contested claim element in claim 16 is the step of "dividing the frequency of the clock signal by the measure of radius . . . ." The function of this step is "to produce a disc velocity signal." (PX 2036, col. 11, lns. 1–2) DMI asserts that this claim element should be construed as a step-plus-function limitation under 35 U.S.C. § 112, ¶ 6. (D.I. 617 at 65) The court finds that § 112, ¶ 6 is implicated by this claim element

---

44. DiscoVision's expert acknowledged at trial that the principles by which "closed-loop" and "open-loop" systems operate are "substantially different." (D.I. 602 at 682–83) DiscoVision's expert stated that the differences between "open-loop" and "closed-loop" systems may be substantial "depend[ing] on what you do." (D.I. 602 at 939) Although DiscoVision's expert also testified that the differences in designing a closed-loop or open-loop system in the accused mastering machines are "insubstantial" (D.I. 602 at 939–42, 975–86), the court views this testimony as simply

asserting that closed-loop and open-loop systems are "interchangeable." As noted above, "interchangeability between claimed and accused elements is not relevant for its own sake." *Warner–Jenkinson, Co.,* 117 S.Ct. at 1053.

45. As cited by DMI, the '860 patent specification distinguishes the invention from both analog and hybrid analog/digital CLV systems. (PX 2036, col. 1, lns. 57–68, col. 2, lns. 1–54)

because "steps plus function without acts are present." *See O.I. Corp.*, 115 F.3d at 1582–83.

■ **25. The '860 Patent: Infringement and the Version Two Machines.** DiscoVision alleges that DMI's version two mastering machines infringe, under the doctrine of equivalents, claims 1, 16, and 21 of the '860 patent. Like the version one machines, the version two mastering machines have a stationary transducer. As construed by the court, the claimed apparatus is limited to structures with moveable transducers. For the reasons stated above with respect to the '326 patent, the court concludes that DiscoVision has failed to carry its burden of establishing that the differences between a moveable transducer and a stationary one are insubstantial.

26. Other differences between the version two mastering machines and the claimed invention relate to the circuitry that produces the desired velocity signals. The version two mastering machines utilize hybrid analog/digital circuitry to produce the desired velocity signals. (¶ 90) In particular, the version two mastering machines utilize analog VCOs, which are subject to nonlinearities and drift. (¶ 91) The record also indicates that version two mastering machines have an "interrupt-driven microprocessor" rather than the "radius register" described in the '860 patent. (¶ 94) In reviewing the record, the court concludes that DiscoVision has failed to carry its burden of proving by a preponderance of the evidence that these differences are insubstantial. Accordingly, the court holds that DiscoVision has failed to prove that DMI's version two mastering machines infringe claims 1, 16, and 21 of the '860 patent.

■ **27. The '860 Patent: Infringement and the Philips Mastering Machine.** DiscoVision also alleges that DMI's Philips mastering machine infringes, either literally or under the doctrine of equivalents, claims 16 and 21 of the '860 patent.[46] The parties have focused the infringement issue on the following claim element: "[D]ividing the frequency of the clock signal by the measure of radius to produce a disc velocity signal."[47] Since this claim element is written in a step-plus-function format, literal infringement is established if the accused method encompasses the "corresponding ... acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. It is undisputed that the Philips mastering machine performs the same function as claimed in claim 16: "[T]o produce a velocity signal." Infringement, either literally or under the doctrine of equivalents, rests on the issue of whether the Philips mastering machine performs equivalent "acts" to achieve the step of dividing the frequency of the clock signal by the measure of radius.

---

46. DMI argues that DiscoVision has been fully compensated for the use of the Philips mastering machine by virtue of DiscoVision's settlement agreement with N.V. Philips Gloeilampenfabriken ("Philips") in 1988. (D.I. 613 at 59–62) As support for its position, DMI cites *Union Tool Co. v. Wilson*, 259 U.S. 107, 113, 42 S.Ct. 427, 66 L.Ed. 848 (1922), for the proposition that once a patentee collects "full compensation" for the use of his invention, the device is free from patent monopoly. *See also Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir.1983) (a patentee may not recover damages for which it has previously received "full compensation"). DMI's argument is without merit.

While the settlement agreement grants Philips a license to, among other things, lease, sell, or otherwise transfer "Manufacturing Apparatus" (PX 2139 at 8), it also provides that such a license does "not include the right of [Philips] to sublicense any third party." (PX 2139 at 9) The settlement agreement also provides that "[n]o license is granted herein, by implication, estoppel or otherwise ... for the use of Manufacturing Apparatus, by persons whom [Philips] leases, sells, or otherwise transfers said Manufacturing Apparatus." (PX 2139 at 9) An appendix to the agreement explains to potential Philips customers that the license granted to Philips "does not extend such patent license to acquirers of Philips mastering machines." (PX 2139 at DV 17 15818) Finally, the court agrees with DiscoVision that there is no evidence in the record to support DMI's assertion that DiscoVision has been "fully compensated" for the use of its CLV mastering patents. (D.I. 618 at 85–87) The settlement agreement expressly states that the purpose of an $11 million payment by Philips to DiscoVision was in "**partial consideration** of the overall settlement ... including the release [ ] and licenses granted." (PX 2139 at 9)

47. Apparently, DMI concedes that the three other claim elements read on the Philips mastering machine. (D.I. 602 at 902–03)

28. The record indicates that the Philips mastering machine performs different acts to produce the velocity signal. In particular, the Philips mastering machine uses an open-loop system to generate the frequency signal that is inversely proportional to the radius signal. (¶ 97) The microprocessor in the Philips mastering machine "computes a value for radius" that is used to generate a frequency signal inversely proportional to the radius signal. (¶ 96) Furthermore, the Philips mastering machine does not have a counter or magnitude comparator to perform the dividing function of the clock signal to produce a velocity signal.

29. In reviewing the record, the court concludes that DiscoVision has failed to carry its burden of demonstrating by a preponderance of the evidence that these differences are insubstantial. DiscoVision failed to adequately explain the similarities and differences between closed-loop and open-loop systems. Furthermore, DiscoVision did not adequately explain the similarities or differences in replacing the magnitude comparator, radius register, and counter with a microprocessor. Accordingly, the court concludes that DiscoVision has failed to prove that DMI's Philips mastering machine infringes claim 16 of the '860 patent. Since claim 21 is dependent on claim 16, the court also concludes that DiscoVision has failed to prove that the Philips mastering machine infringes claim 21 of the '860 patent.

■ 30. **The '490 Patent: Claim Construction.** Although claims 6 [48] and 11 [49] are at issue in this case, claim 3 contains the specific claim limitation in dispute.[50] The claimed optical disc or record medium has a surface with a succession of marks and spaces. (PX 1010, col. 6, ln. 68, col. 7, ln. 44) The disputed limitation describes these marks and spaces in further detail:

[S]aid succession of marks and spaces including portions of a predetermined length which represent encoded portions of a succession of original binary bits, which are encoded using a coding system whereby every portion of original binary bits encodes into an encoded portion which unambiguously represents said every portion of original binary bits, in a way such that said encoded portion includes information without additional information about portions other than the portion being decoded.

(PX 1010, col. 7, lns. 12–22) [51]

31. The court suggests at the outset that the above language is one of the most inartfully crafted claim limitations presented for construction. Nonetheless, DiscoVision has urged the court to parse out individual words and phrases for expert construction. More specifically, DiscoVision argued at trial that an "encoded portion" refers to electrical pulses or channel bits, **not** to the physical representation of such by the variable lengths of marks and spaces. DiscoVision further argued that the act of "decoding" is accomplished only through the use of look-up tables, again not by direct reference to the variable lengths of marks and spaces, the physical representation of stored information. Based on its construction, DiscoVision asserts that DMI infringes the '490 patent because, ultimately, the "encoded portions" on a DMI CD are decoded using a look-up table.

32. While the court appreciates DiscoVision's point of view, the court continues to believe that the construction proffered by

**48.** Claim 6 covers an "optical disc" comprising several limitations.

**49.** Claim 11 covers a "record medium" with essentially the same limitations as provided in claim 6.

**50.** Claim 6 is dependent on claim 3. Claim 11 is dependent on claim 9. Claim 9, however, contains essentially the same disputed language as in claim 3.

**51.** Claim 9 contains essentially the same language:

[P]ortions of the succession of alternating mark regions and space regions representing encoded portions, encoded using a coding system whereby every portion of original binary bits which represent the recorded information encoded into an encoded portion which unambiguously represents said every portion of original binary bits in a way such that said encoded portion includes information allowing decoding into said every portion without additional information about portions other than the portion being decoded.

(PX 1010, col. 7, ln. 64 – col. 8, ln. 9)

DiscoVision is inconsistent with both the claim language and the specification of the '490 patent. The specification explains that "[t]he present invention is embodied in a system for recording and playing back digital information on a record medium." (PX 1010, col. 1, ln. 67 – col. 2, ln. 1) The "video disc system" is further described in the specification as including "recording apparatus" (e.g., "modulators") and "playback apparatus" (e.g., "demodulators" and "decoders"). The claims themselves, however, are not directed to the entire system, but only to the physical characteristics of the "record medium"—an "optical disc" (in claims 3 and 6) or an "optical record medium" (in claims 9 and 11). Therefore, although "encoding" and "decoding" are necessary aspects of a video disc system, neither is an object of the invention.[52] Rather, the objects of the invention, as reflected in the claim language, are directed to the physical characteristics of the record media: (1) increasing the storage capacity of these record media by representing digital information more densely in the physical characteristics, i.e., the variable lengths of both the marks and the spaces; and (2) increasing recording efficiency by requiring each "predetermined length" of a mark or space to "unambiguously represent" a particular succession of original binary bits.[53]

33. In sum, the court declines DiscoVision's invitation to construe words such that their interpretation may make sense in isolation but not in the context of the patent. The language in dispute is construed to require that the predetermined length of a mark or a space or a mark/space combination unambiguously represents a particular succession of original binary bits.

34. **The '490 Patent: Infringement.** It is undisputed that DMI's CDs are manufactured using the EFM coding system and the NRZI recording technique. (¶¶ 112, 115) It is further undisputed that DMI's CDs contain marks, spaces, and mark-space combinations that "straddle" two different original eight-bit code blocks (¶ 115), requiring additional information to determine whether a particular length of a mark or space represents a particular eight-bit code block. (¶ 115) Under these circumstances, an infringement analysis collapses into one of claim construction. *See Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996). The court has construed the relevant claims such that they do not read on DMI's CDs. Accordingly, the court concludes that DiscoVision has failed to prove that DMI's CDs, substrates, stampers, and masters infringe claims 6 and 11 of the '490 patent.

### C. Legal Standards for Invalidity

35. "A patent is presumed valid, and the burden of proving invalidity, whether under § 112 or otherwise, rests with the challenger. Invalidity must be proven by facts supported by clear and convincing evidence." *United States v. Telectronics, Inc.,* 857 F.2d 778, 785 (Fed.Cir.1988). The issues of enablement and obviousness are questions of law; however, a determination of enable-

---

52. DMI's expert testified that the '490 patent "is about modulation, not about coding." (D.I. 604 at 1280) DMI's expert explained that the '490 patent does not "teach a coding step." (D.I. 604 at 1298–99) DMI's expert explained the innovative features of the '490 patent as follows:

[The unambiguous relationship between code blocks and the physical length of a mark or space] is the one feature that—it's one aspect of why [the '490] invention was patentable and was unique art in the first place. That is the fact that, in order to decode, one only had to grab from the disc a single feature, a single pulse or a single space. And that space was unambiguously related to the object of why you are doing the exercise in the first place; namely, to recover the user data.

And, moreover, that particular feature stands alone. You needed no other information any-

where to get it. It is either a pit or a space, I get a pit or a space. I don't have to know where it came from. I don't have to know how I got it. I just know that length means it.
(D.I. 604 at 1299–1300)

53. The patent specification provides:

The length of each mark is representative of a separate one of a succession of multi-bit binary code blocks. In accordance with the invention, the spaces between successive marks also have discretely-variable lengths representative of separate blocks in the succession of code blocks. Digital information is thereby recorded on the record medium with a yet higher recording efficiency.
(PX 1010, col. 2, lns. 3–10)

ment or obviousness is based on factual inquiries. *See, e.g., In re Goodman,* 11 F.3d 1046, 1049–50 (Fed.Cir.1993); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996).

 36. **Anticipation: 35 U.S.C. § 102.** Patent invalidity based on anticipation is a question of fact. *See Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.,* 45 F.3d 1550, 1554 (Fed.Cir. 1995). Anticipation is established if every element of a properly construed claim is present in a single prior art reference. *See id.; see also PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1566 (Fed.Cir. 1996); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir.1991). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found.,* 927 F.2d at 1576.

In determining whether a patented invention is anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. If needed to impart clarity or avoid ambiguity, the prosecution history and the prior art may also be consulted in order to ascertain whether the patentee's invention is novel or was previously known to the art.

*Glaverbel Societe Anonyme,* 45 F.3d at 1554. Extrinsic evidence may be appropriate "to explain the disclosure of a reference." *Scripps Clinic & Research Found.,* 927 F.2d at 1576. Extrinsic evidence is of "limited scope and probative value" since "anticipation requires that all aspects of the claimed invention were already described in a single reference." *Id.,* Thus, extrinsic evidence may not be used to "prove facts beyond those disclosed in the reference in order to meet the claim limitations. The role of extrinsic evidence is to educate the decision-maker to what the reference meant to persons of ordinary skill in the field of the invention, not to fill gaps in the reference." *Id.*

 37. Nevertheless, anticipation may be established if a missing claim element is within the knowledge of one of ordinary skill in the art. *See In re Graves,* 69 F.3d 1147, 1152 (Fed.Cir.1995). This "gap in the reference may be filled with recourse to extrinsic evidence." *Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1267–68 (Fed.Cir.1991). "Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Id.* (citing *In re Oelrich,* 666 F.2d 578, 581 (Cust. & Pat.App.1981)). Thus, extrinsic evidence of the knowledge of one of ordinary skill in the art is relevant in situations where

the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges.

*Id.* at 1269. Extrinsic evidence has a limited scope in determining anticipation. It may be used to explain but not expand the meaning of a reference. *See In re Baxter Travenol Labs.,* 952 F.2d 388, 390 (Fed.Cir.1991).

 38. **Obviousness: 35 U.S.C. § 103.** A patent is invalid under 35 U.S.C. § 103

if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Obviousness under § 103 is a legal conclusion based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; and (3) the level of ordinary skill in the pertinent art. *See Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). "Objective evidence such as commercial success, copying, or long-felt need, is relevant, and when present must be considered." *Glaverbel Societe Anonyme,* 45 F.3d at 1555 (citing *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–1539 (Fed.Cir. 1983)); *see also B.F. Goodrich Co.,* 72 F.3d at 1582.

 39. "[T]he burden of showing, by clear and convincing evidence, the invalid-

ity of the [patent] claims ... is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed.Cir. 1990). Where there is "no PTO view ... on obviousness in view of [the asserted] references[,] ... [the] burden of proof ... is more easily carried." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 905 (Fed.Cir.1985). The burden of proof on invalidity remains with the party challenging the patent. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed.Cir. 1984).

40. When obviousness is based on prior art references, "there must be a showing of a suggestion or motivation to modify the teachings" of those references. *B.F. Goodrich Co.*, 72 F.3d at 1582. This suggestion to modify the art need not be expressly stated in the references; " '[r]ather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.' " *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed.Cir.1985) (quoting *In re Keller*, 642 F.2d 413, 425 (Cust. & Pat.App.1981)). Hindsight reconstruction and/or "the blueprint drawn by the inventor," *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed.Cir.1985), may not be used "to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention," *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir.1988); *see also Kahn v. General Motors Corp.*, 135 F.3d 1472, 1479 (Fed.Cir.1998) (stating that "[o]bviousness may not be established using hindsight"). " '[T]he question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.' " *In re Beattie*, 974 F.2d 1309, 1311 (Fed.Cir.1992) (quoting *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1462 (Fed.Cir.1984)); *accord In re Fine*, 837 F.2d at 1074–75; *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984).

41. **Invalidity: Under 35 U.S.C. § 112.** The Patent Act requires that a patent specification contain (1) an enabling disclosure; (2) a sufficient written description of the claimed invention; and (3) a disclosure of the best mode of carrying out the invention. The relevant statutory language appears in the first paragraph of § 112 of the Patent Act:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

42. **Enablement.** Under the enablement requirement, a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. *See In re Wright*, 999 F.2d 1557, 1561 (Fed.Cir.1993); *see, e.g., U.S. v. Telectronics, Inc.*, 857 F.2d 778. As apparent from § 112, a patent specification is required to contain a disclosure, either through illustrative examples or written description, that is sufficient to teach one skilled in the art how to make and use the invention as broadly as it is claimed. *See In re Vaeck*, 947 F.2d 488, 496 (Fed.Cir.1991). "[I]t is not necessary that a patent applicant test all the embodiments of his invention; what is necessary is that he provide a disclosure sufficient to enable one skilled in the art to carry out the invention commensurate with the scope of his claims." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed.Cir.1991) (internal citation omitted); *accord In re Vaeck*, 947 F.2d at 496 ("It is well settled that patent applicants are not required to disclose every species encompassed by their claims, even in an unpredictable art."). Furthermore, a patent need not teach that which is well known in the art. *See Hybritech, Inc.*, 802 F.2d at 1384; *Lindemann Maschinenfabrik GMBH*, 730 F.2d at 1463.

43. A disclosure may be enabling even though a considerable amount of routine experimentation is required to prac-

tice the invention. *See PPG Indus. Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed.Cir.1996); *see also Telectronics, Inc.*, 857 F.2d at 785. The fact that some experimentation is necessary does not preclude enablement as long as the amount of experimentation is reasonable given the nature of the invention and the state of the art. *See In re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988). If "undue" experimentation is required to make and use the invention, however, the patent fails to satisfy the enablement requirement. *See PPG Indus., Inc.*, 75 F.3d at 1563–65.

> The determination of what constitutes undue experimentation in a given case requires the application of a standard of reasonableness, having due regard for the nature of the invention and the state of the art. The test is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed....
>
> \* \* \* \* \* \*
>
> Factors to be considered in determining whether a disclosure would require undue experimentation ... include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d at 737 (internal citations and footnotes omitted) (quoting *In re Jackson*, 217 U.S.P.Q. 804, 807 (Pat.& Tr. Office Bd.App.1982)). The mere fact that repetitive experimentation is required does not make it excessive where such experimentation is routine. *See Johns Hopkins Univ. v. CellPro*, 931 F.Supp. 303, 322, 324 (D.Del. 1996), *aff'd in part, vacated in part*, 152 F.3d 1342, 1998 WL 466633 (Fed.Cir.1998).

■ 44. Finally, a patent is not a production document and details required for commercial exploitation of the invention need not be given. *See Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed.Cir. 1990) (patent document not intended to be a production specification); *Application of Gay*, 50 C.C.P.A. 725, 309 F.2d 769, 774 (Cust. & Pat.App.1962); *see, e.g., Christianson v. Colt Indus. Operating Corp.*, 822 F.2d 1544, 1562 (Fed.Cir.1987), *vacated on other grounds*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

■ 45. **Written Description.** The written description requirement is separate and distinct from the enablement requirement. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed.Cir.1991). The written description requirement is "broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Id.* (emphasis in original). In other words, a patent must " 'clearly allow persons of ordinary skill in the art to recognize that [the patentee] invented what is claimed.' " *In re Alton*, 76 F.3d 1168, 1172 (Fed.Cir.1996) (quoting *In re Gosteli*, 872 F.2d 1008, 1012 (Fed.Cir.1989)). A challenger must provide clear and convincing evidence that persons skilled in the art would not recognize in the disclosure a description of the claimed invention. *See id.* at 1175.

■ 46. **Best Mode.** The Federal Circuit has described the best mode requirement as having two components:

> The first is a subjective one, asking whether, at the time the inventor filed his patent application, he contemplated a best mode of practicing his invention. If he did, the second inquiry is whether his disclosure is adequate to enable one skilled in the art to practice the best mode or, in other words, whether the best mode has been concealed from the public.... Our case law has interpreted the best mode requirement to mean that there must be no concealment of a mode known by the inventor to be better than that which is disclosed.

*Amgen, Inc.*, 927 F.2d at 1209–10. "[S]pecific intent to deceive is not a required element of the best mode defense." *Graco, Inc. v.*

*Binks Mfg. Co.*, 60 F.3d 785, 789–90 (Fed.Cir. 1995). Any concealment of the best mode, whether accidental or intentional, is a violation of the best mode requirement. *See Dana Corp. v. IPC Ltd.*, 860 F.2d 415, 418 (Fed.Cir.1988); *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535 (Fed.Cir. 1987); *In re Sherwood*, 613 F.2d 809, 816 (Cust. & Pat.App.1980). *Cf. Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1575 (Fed.Cir.1992) ("Invalidity for violation of the best mode requires intentional concealment of a better mode than was disclosed.") (citation omitted). According to the Federal Circuit,

> one must consider the level of skill in the relevant art in determining whether a specification discloses the best mode.... [W]hether a best mode disclosure is adequate, that is, whether the inventor concealed a better mode of practicing his invention than he disclosed, is a function of not only what the inventor knew but also how one skilled in the art would have understood his disclosure.

*Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927 (Fed.Cir.1990). A failure to comply with the best mode requirement is a question of fact and must be proven by clear and convincing evidence. *See Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed.Cir.1991).

### D. Validity Analysis

47. **The '297 Patent.** DMI argues that the '297 patent is invalid based on five separate theories: (1) anticipation; (2) obviousness; (3) lack of enablement; (4) insufficient written description; and (5) failure to disclose the best mode. The court shall address each theory *seriatim.*

48. **The '297 Patent: Anticipation.** DMI argues that the Boswell patent anticipates claims 1 and 13 of the '297 patent. (D.I. 613 at 16–24) DiscoVision argues that Boswell does not anticipate claims 1 and 13 because it lacks a disclosure of the claimed "discrete surface indicia, interval portions, and intertrack regions." (D.I. 618 at 14–16)

49. Claims 1 and 13 are limited to a disc-shaped member with three-dimensional features comprised of "discrete surface indicia," "interval portions," and "intertrack portions." (PX 30, col. 5 lns. 26–49) [54] In particular, the planar surface area of the disc-shaped member is comprised of interval portions and intertrack portions, whereas the discrete surface indicia "extend away from the plane of said surface area." (PX 30, col. 5, lns. 29–32) The Boswell patent does not teach the use of three-dimensional structures as features of a recording path. (¶ 34) Moreover, persons of ordinary skill in the art at the time of the invention would not have been able to use the Philips–Miller reference to create discrete surface indicia with constant widths in a recording path. (¶¶ 35–37) Accordingly, the Boswell patent does not disclose every element in claims 1 and 13. Consequently, the court concludes that DMI has failed to prove that claims 1 and 13 are invalid for anticipation.

50. **The '297 Patent: Obviousness.** [55] DMI asserts that claims 1, 10, and 13 of the '297 patent are obvious in view of the combined teachings of the Philips–Miller article, the Boswell patent, and the Dove patent. (D.I. 613 at 23–29) DiscoVision asserts that the Philips–Miller article and the Boswell patent teach away from the use of discrete surface indicia and three-dimensional replication techniques. (D.I. 618 at 25–27) DiscoVision also argues that the Dove patent not only lacks those elements missing in the Boswell/Philips–Miller references, but also that there is no teaching or suggestion in the Dove patent that it be combined with these references. (D.I. 618 at 27–30)

51. The court finds that the claims at issue teach the use of three-dimensional, discrete surface indicia with constant width and variable length to represent information, as well as the use of three-dimensional replica-

---

**54.** As noted above, claim 13 is dependent on claim 1. (PX 30, col. 6, lns. 26–28)

**55.** With respect to the '297 patent, the court determines that one of ordinary skill in the art is a person with an electrical engineering or phys-

ics degree and several years experience in optical information storage systems. Instead of a degree, a person of ordinary skill may be someone with the equivalent experience.

tion techniques. The Boswell and Philips–Miller prior art fail to teach the use of three-dimensional discrete surface indicia with variable lengths and constant widths. (¶¶ 31–37) In addition, neither reference teaches the use of three-dimensional replication techniques. (¶¶ 26, 34) In contrast, the Dove patent is directed towards a recording using holes or partial holes, without specific concern for the size, shape, or location of these holes in the recording medium. (¶¶ 41–43). The Dove patent does not teach the use of (1) surface indicia with constant widths and variable lengths or (2) three-dimensional replication techniques such as stamping or embossing. (¶ 43)

52. **The '297 Patent: Secondary Considerations.** The record indicates that there was a strong felt need for new high density information storage technologies after World War II. (¶ 4) Prior to the '297 invention, the prevailing technology was a new magnetic video recording process. (¶ 4) Scientists sought to find a competitor to this magnetic recording by exploring electrostatic, thermoplastic, hole burning, photographic, and capacitive recording techniques. (¶¶ 5–9) Although these recording techniques failed, the optical disc emerged as a successful competitor to magnetic recordings because it could store information at a significantly higher density. (¶ 10)

53. There is no suggestion or teaching in the Dove patent to combine it with either the Boswell patent or the Philips–Miller article. (¶ 43) Moreover, given the differences in content, there is nothing in either the Boswell/Philips–Miller reference or the Dove patent, as a whole, to suggest the desirability of combining them. Even if there existed motivation to combine the references, the deficiencies in the Boswell patent and the Philips–Miller article are not cured by the Dove patent. Consequently, the court concludes that DMI has failed to prove that the teachings of these references render the claimed invention in the '297 patent obvious.

■ 54. **The '297 Patent: Enablement.** DMI argues that since the '297 patent is claimed to cover its CDs, it is invalid for failing to disclose a disc that can be read using phase interference principles. (D.I.

613 at 31–32) DMI also argues that the '297 patent is invalid for failing to disclose how to make a master die member. (D.I. 613 at 32) It is undisputed that the '297 patent does not disclose a reflective phase interference disc and does not disclose the details of making a master die member. These deficiencies in the patent, however, do not render the patent invalid.

■ 55. A patent need only provide "a disclosure sufficient to enable one skilled in the art to carry out the invention commensurate with the scope of [the] claims." *Amgen, Inc.,* 927 F.2d at 1213; *see In re Vaeck,* 947 F.2d at 496 (patent is required to provide a disclosure sufficient to teach one skilled in the art how to make and use the invention as broadly as it is claimed). Nonenablement "does not depend on the applicant advocating a particular embodiment or method for making the invention." *Spectra–Physics, Inc.,* 827 F.2d at 1534 (Fed.Cir.1987).

■ 56. The enablement requirement does not require a disclosure of knowledge that is well known in the art. *See Hybritech, Inc.,* 802 F.2d at 1384. Phase interference principles were well known in the art during the 1960s. (¶ 46) In particular, reflective and transmissive optical reading systems were well known to those of ordinary skill during this time period. (¶ 47) The '297 patent teaches the use of micron-sized, three-dimensional surface indicia. (¶ 21) The specific shape of these surface indicia is depicted in figures 2 and 4 of the '297 patent specification. (PX 30, figs. 2 and 4) It was well known in the art during the relevant period that micron-sized, three-dimensional features in a transparent disc would cause phase interference effects. (D.I. 607 at 2200–05) Accordingly, by applying routine skill to the teachings of the '297 patent, one of ordinary skill in the art could have produced a disc with surface indicia that could be read solely by phase interference principles. (D.I. 607 at 2155–59) Thus, the court concludes that DMI has failed to prove that claim 1 of the '297 patent is invalid for failure to provide a sufficient enabling disclosure.

57. Moreover, one of ordinary skill in the art during the time of the invention would

have known how to make a master and a stamper disc from the teachings of the '297 patent. (¶¶ 48–49) In particular, photolithography techniques using lasers and photoresist were well known to those of ordinary skill in the art during the relevant time period. (¶ 48) Although the work to design a prototype disc would have taken several months to a year, this type of work would have been considered routine and straightforward. (¶ 48) Accordingly, the court concludes that DMI has failed to prove that claim 13 is invalid for failing to provide a sufficient enabling disclosure.

■ 58. **The '297 Patent: Written Description.** DMI argues that the '297 patent is invalid under § 112 because it fails to describe a phase disc. (D.I. 613 at 33) The '297 patent describes micron-sized, three-dimensional features in a transparent disc which cause phase interference effects. (¶¶ 21, 46; D.I. 607 at 2200–05) Since phase interference principles were well known during the relevant time period, including both reflective and transmissive systems (¶ 47), the court concludes that DMI has failed to prove by clear and convincing evidence that persons of ordinary skill in the art would not have recognized in the disclosure the claimed invention. Accordingly, the court holds that DMI has failed to prove that the '297 patent is invalid for failing to provide a sufficient written description pursuant to § 112.

59. **The '297 Patent: Best Mode.** DMI asserts that claims 1 and 13 are invalid because the specification does not disclose the best mode for practicing the invention. (D.I. 613 at 34) According to DMI, the best mode contemplated by the '297 inventor included placing a clear plastic coating over the disc surface. (D.I. 613 at 35) Although the '297 patent does not disclose the use of a protective plastic coating over the disc surface, the '297 inventor considered the use of a plastic protective coating to be the best way to practice the invention. (¶ 22)

■ 60. Concealment of the best mode is a violation of the best mode require-

ment. *See Graco, Inc.*, 60 F.3d at 789–790. The inventor, however, need only disclose his or her best mode of carrying out the claimed invention. *See Chemcast Corp.*, 913 F.2d at 927. "Unclaimed subject matter is not subject to the disclosure requirements of § 112; the reasons are pragmatic: the disclosure would be boundless, and the pitfalls endless." *Engel Indus., Inc.*, 946 F.2d at 1531. Finally, "[e]ach claim must be considered individually for compliance with the best mode requirement." *Id.*

■ 61. Both claim 1 and dependent claim 13 are directed to disc-shaped members. The underlying structure of such disc-shaped members, as described in claim 1, does not include the clear plastic coating. (¶ 20) The court concludes, therefore, that the disclosure of a protective coating is not a § 112 best mode requirement for claims 1 and 13 of the '297 patent.

■ 62. Even if disclosure of the protective coating were required by § 112, the court concludes that DMI has failed to prove any concealment, intentional or accidental, on the part of the '297 inventor. The '297 patent specification explicitly states that the present invention is related to the transparent record disc disclosed in the '966 patent. (¶ 19; D.I. 604 at 1544; D.I. 607 at 2174) The '966 patent is directed towards "an improved record disc." (¶ 16) One of the improvements of this record disc is the use of a transparent plastic coating over the side of the disc with the metallic deposits and transparent grooves and channels. (¶ 18) Given the explicit reference in the '297 patent to the protective coating disclosed in the '966 patent, DMI has failed to prove by clear and convincing evidence that there was any concealment of the '297 inventor's best mode. Accordingly, the court concludes that DMI has failed to prove that claims 1 and 13 are invalid for violating the best mode requirement.

■ 63. **The '326 Patent: Obviousness.**[56] DMI argues that claims 2 and 8 of

---

56. The court determines that one of ordinary skill in the art at the time of the invention for the '326 (as well as the '860 patent) is a person with a bachelors or masters of engineering (elec-

trical or control engineering and theory) with two to three years experience. (D.I. 602 at 836, 900)

the '326 patent are invalid as obvious under § 103 based on the combination of the Bringol patent, the spindle servo mechanism in the Dakin reissue patent, and a VCO. (D.I. 613 at 49–54) In response, DiscoVision argues that: (1) DMI's proposed combination of prior art should be precluded because it is an improper surprise;[57] (2) Bringol is not relevant prior art; and (3) the proposed combination of prior art is impermissible hindsight reconstruction. (D.I. 618 at 54–62)

64. The court finds that claim 2 of the '326 patent covers an apparatus with means for producing a velocity signal with a frequency. (¶ 65) The claimed apparatus is comprised of a tachometer and phase detector means. (¶ 65) Claim 8 of the '326 patent is a method claim that comprises steps for producing a frequency signal and a tachometer signal. (¶ 65) Claim 8 also involves a step of comparing the phase angles of the tachometer signal (i.e., a step involving the use of a phase detector).

65. The Bringol patent does not teach or suggest the use of a VCO to create a frequency signal or a spindle servo mechanism with a tachometer or phase detector as part of the claimed CLV recording system. (¶ 68) Although these missing elements were known to those of ordinary skill in the art at the time of the invention,[58] there is nothing in the Bringol patent that teaches or suggests the combination of these missing elements. Moreover, there is insufficient evidence in the record to explain why one of ordinary skill in the art would combine these missing elements with the Bringol invention. Nor does the prior art as a whole suggest a desirability to combine the missing elements with Bringol. Accordingly, the court concludes that DMI's obviousness position with respect to claims 2 and 8 of the '326 patent is, as DiscoVision has argued, impermissible hindsight reconstruction. *See Kahn*, 135 F.3d at 1479 (obviousness may not be established using hindsight). Consequently, the court concludes that DMI has failed to establish by clear and convincing evidence that claims 2 and 8 of the '326 patent are invalid for obviousness.

■ 66. **The '860 Patent: Obviousness.**[59] DMI argues that claims 1, 16, and 21

**57.** DiscoVision has renewed its objection to DMI's "surprise argument" and moves for preclusion under Federal Rule of Civil Procedure 37. (D.I. 613 at 54 n. 42; D.I. 602 at 875–76) It is undisputed that the combination of the Bringol patent with the spindle servo mechanism in the Dakin reissue patent was not disclosed in DMI's expert report on the '326 patent. (D.I. 613 at 54 n. 21; D.I. 602 at 875–76) Rule 26 of the Federal Rules of Civil Procedure provides that expert reports shall contain a complete statement of all opinions to be expressed at trial and the basis for those opinions. *See* Fed.R.Civ.P. 26(a)(2)(B). Rule 26 also "obligates a party to supplement the report if it 'learns that in some material respect the information disclosed is incomplete or incorrect.'" *Coalition To Save Our Children v. State Bd. of Educ.*, 90 F.3d 752, 775 (3d Cir.1996) (Sarokin, J., dissenting) (quoting Fed.R.Civ.P. 26(a)(2)(B) & (e)(1)). "Exclusion of testimony is an appropriate sanction for failure to supplement in a timely manner." *Id.*

In reviewing the record, the court declines to preclude DMI's proffered testimony. As established during the pretrial conference, expert testimony would be limited to opinions disclosed in the experts' reports and new theories advanced after the close of discovery would not be considered. (D.I. 584 at 19–22, 29) The record, however, indicates that DiscoVision was put on notice of the proposed invalidity theories with respect to the '326 patent prior to trial. First, a discussion of the Dakin reissue servo mechanism as prior art is included in DMI's expert report on the '860 patent. (D.I. 374 at 16) Second, DMI identified the Dakin reissue patent as one of the prior art references it would rely on for its invalidity defenses. (D.I. 574 at 1) Finally, DMI specifically stated in its pretrial statement that the Dakin reissue patent would be used in combination with, among other things, the Bringol patent to support its invalidity defense against the '326 patent. (D.I. 579 at 4) Given these undisputed facts, the court concludes that exclusion of the testimony at issue is inappropriate.

**58.** One of ordinary skill in the art during the relevant time period would have known about CLV recordings. (¶ 82) In particular, this person would have known that a potentiometer connected to a transducer would provide the necessary one (1) over radius (R) relationship to achieve a CLV recording. (¶ 82) A person of ordinary skill during this time period also would have known about spindle motor servo mechanisms utilizing a tachometer and phase detector. (¶¶ 69–71, 81) This same person would also have known about VCOs. (¶ 81)

**59.** One of ordinary skill in the art during the relevant time period would have known about the use of spindle motor servo mechanisms in making a CLV recording. (¶¶ 69–71, 81–82) This person also would have known, through the Bringol patent, how to produce a one (1) over radius (R) function using a potentiometer. (¶ 82)

of the '860 patent are invalid as obvious under 35 U.S.C. § 103. In particular, DMI argues that these claims are invalid based on the combination of the Bringol patent, the Katsuoka patent, and the knowledge of one skilled in the art. (D.I. 613 at 55–59; D.I. 621 at 24–26) DiscoVision responds by arguing that DMI has failed to provide clear and convincing evidence that one of ordinary skill would have combined the prior art. DiscoVision claims that DMI's obviousness argument is impermissible hindsight reconstruction.

67. The court finds that the '860 patent discloses an apparatus and method for recording information on a disc in a CLV format. Claim 1 of the '860 patent covers an apparatus that includes means for producing a disc velocity signal that is substantially inversely proportional to the radial location of a transducer. (¶¶ 74–76) Claim 16 covers the method for rotating an information storage disc and includes a step for producing a disc velocity signal that is substantially inversely proportional to a measure of radius. (¶¶ 74–76) Claim 21 covers the method in claim 16, with two additional steps relating to a transducer velocity signal and the radial velocity of the transducer relative to the rotating disc. (¶ 76) The apparatus and methods in claims 1, 16, and 21 all involve the use of a spindle servo mechanism to produce the desired velocity signals. (¶¶ 74–76)

68. The Katsuoka patent discloses a digital circuit that produces a signal having a one (1) over time (T) relationship with an input signal. (¶¶ 77, 78) The Katsuoka patent does not discuss the application of the disclosed digital circuit to the recording of data, and the Katsuoka invention would have to be modified in order for radial inputs to be added. (¶ 80) Neither does the Katsuoka patent disclose a spindle servo mechanism or teach a circuit designed to receive radial inputs or produce a signal with a one (1) over radius (R) relationship. (¶ 80) Although some of these missing elements were known to those of ordinary skill in the art during the relevant time period, the court concludes that DMI has failed to prove that one of ordinary skill in the art during the relevant

time period would have known how to substitute the Katsuoka circuit into the Bringol invention. As Discovision has noted, the Katsuoka circuit itself requires "reengineering" in DMI's obviousness analysis. (D.I. 618 at 65) Furthermore, the prior art as a whole does not suggest a motivation to make the combination DMI desires. Accordingly, the court concludes that DMI's obviousness position with respect to claims 1, 16, and 21 of the '860 patent is impermissible hindsight reconstruction. *See Kahn*, 135 F.3d at 1479. Consequently, the court concludes that DMI has failed to establish by clear and convincing evidence that claims 1, 16, and 21 of the '860 patent are invalid for obviousness.

69. **The '490 Patent: Anticipation.** DMI's obviousness argument with respect to the '490 patent is contingent on the court's claim construction. According to DMI, under DiscoVision's claim construction, claims 6 and 11 of the '490 patent are invalid as anticipated by the Doi article. (D.I. 613 at 38–47) Since the court has rejected DiscoVision's claim construction with respect to the '490 patent, DMI's anticipation argument is moot.

## IV. CONCLUSION

Based on the record presented at trial, the court concludes that DiscoVision has proven that DMI's CDs infringe claims 1 and 13 of the '297 patent. DiscoVision, however, has failed to establish infringement with respect to: (1) claim 10 of the '297 patent; (2) claims 2 and 8 of the '326 patent; (3) claims 1, 16, and 21 of the '860 patent; and (4) claims 6 and 11 of the '490 patent. The court also concludes that DMI has failed to prove that any of the asserted patents are invalid. An order shall issue consistent with these findings.[60]

---

**60.** The court notes that DMI also argues that it is entitled to a finding of noninfringement with respect to the asserted patent claims for which

DiscoVision failed to present evidence. (D.I. 617 at 69–70) The court disagrees.